In re CLARENCE DIXON et al., Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. CLARENCE DIXON, SR., Respondent-Appellant.)

Third District   No. 79-206

Opinion filed February 28, 1980.

494

Dennis A. DePorter, of Braud, Warner, Neppl, Westensee, Ltd., of Rock Island, for appellant.

Edward Keefe, State's Attorney, of Rock Island (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

On December 28, 1978, the Circuit Court of Rock Island County terminated the parental rights of Clarence and Joyce Dixon on the grounds that they were unfit parents. The court also empowered the guardianship administrator of the Department of Children and Family Services to consent to the adoption of the Dixons' three minor children, Clarence Jr. (Clancy), Barbara, and Joyce Jr. (JoJo). It is from this order that the appellant, Clarence Dixon, Sr., appeals. The children's mother, Joyce Dixon, Sr., is not a party to this appeal.

The State called a number of witnesses at the hearing on the petition to terminate the Dixons' parental rights and we believe it necessary to detail their testimony. The first was Dr. Roger Gennari, a clinical psychologist associated with the Rock Island Mental Health Center. In 1974, Clancy, then age two, was referred to Dr. Gennari by the pediatric department of Franciscan Hospital where he had been hospitalized at his mother's request. Dr. Gennari found that Clancy's intellectual and motor development was "severely delayed." He also found marks of physical abuse on Clancy's body. Dr. Gennari was of the opinion that bruises and burns on Clancy's ankles were caused by a restraint. He testified that at this time his recommendation was continued hospitalization for Clancy and removal from his parents' care. Later in the year he had the opportunity to examine Barbara Dixon, who was then four years old. This examination came at the request of the Department of Children and Family Services. Dr. Gennari found that, like her younger brother, Barbara suffered from "developmental delay." He testified that she was moderately retarded, but that her retardation was due to psycho-social deprivation. Dr. Gennari defined psycho-social deprivation as follows:

"In general it is a situation where what is considered normal input and care for children is lacking, so that there is a decrease in developmental growth, meaning psychological growth, and in intellectual growth. We typically will look for lack of affection between mother and child, lack of proper physical care, isolation of the child from other children, poor physical environment, that sort of thing.

What the diagnosis is saying is that there is presently retardation, but it is due to environmental reasons rather than demonstrable internal events of the child."

On the basis of his evaluation of Barbara, Dr. Gennari recommended that she be placed in a foster home, that she continue in the special education program she was currently attending, and that she be re-evaluated in six months. When Dr. Gennari saw Barbara six months later, he found her progress to be "amazing." During this period of time Barbara had been in a foster home.

In June of 1975, the Dixons came to Dr. Gennari for evaluation and possible therapy, having been referred to him by Marilyn Wade, a worker at the Department of Children and Family Services. At the second meeting with the Dixons, Dr. Gennari spoke with each privately. Clarence Dixon told him at the time that he was worried "because Mrs. Dixon was very cold toward the children." He also thought that she was a poor mother, and voiced concern about her outbursts of temper toward both him and their children. According to Dr. Gennari, Clarence Dixon stated that "he would get rid of Mrs. Dixon if she didn't behave differently in the home." However, when Dr. Gennari later asked Mrs. Dixon if her husband had been "pressuring" her to alter her attitude toward her family, she replied that he had not. Dr. Gennari also stated that although the Dixons' attendance at a weekly abusive parents group had been erratic at first, it gradually improved. The direct examination of Dr. Gennari concluded when he stated that he felt the Dixons had not made the necessary progress to have their children returned to them.

On cross-examination by Ms. Diehl, the guardian ad litem, Dr. Gennari elaborated on the basis for his conclusion, particularly in regard to Mr. Dixon. He stated that he had some doubts about the genuineness of Clarence Dixon's concern about his wife's maternal abilities. Dr. Gennari believed that Mr. Dixon was trying to evade responsibility for the children's condition by placing the blame on his wife. "I thought he was trying to make her the scapegoat as though he had nothing to do with what was going on," Dr. Gennari testified. Ms. Diehl then asked Dr. Gennari:

"Q. Do you feel that Mr. Dixon was able to assume, through these three years of counselling, any more responsibility in the family or see any progress in that area?

A. No, I really didn't. I thought he still maintained that the problem was Joyce's, would always be, and that he wasn't to be all that involved with taking care of the children."

On a scale from one to 10, with the best parenting skills at 10 and no parenting skills at one, Dr. Gennari gave Mr. Dixon a two, "Mainly because he doesn't do anything with the children." On the same scale he gave Mrs. Dixon, whom he considered to be developmentally disabled, a three.

The second witness for the State was Marilyn Wade, a child-abuse team leader for the Department of Children and Family Services from

1974 until June 1978. Ms. Wade first became involved in the Dixon case after Clancy was hospitalized in 1974. Subsequent to Clancy's hospitalization Ms. Wade made a number of visits to the Dixon home. On one of these occasions when Barbara's behavior was very distracting, Ms. Wade testified that the following occurred:

"Mr. Dixon took a belt that hung between the living room and kitchen on a wall there, and put it over his back and told her to get back, sit down. With that the child, kind've like a frightened animal, became very quiet, backed down, sat in the corner, cross-legged, for the whole time I was there. Didn't speak. But it was with the belt. And she looked terrified."

Ms. Wade further testified that Mrs. Dixon admitted tying Clancy's legs together while on the potty chair because "he wouldn't sit still." Mr. Dixon did not indicate to Ms. Wade at this time that he knew of his wife's actions, although he did telephone Ms. Wade "many times to voice his concern that the woman wasn't treating the kids rights [sic]." Despite this apparent concern, Ms. Wade's requests that Clarence Dixon take the children to the doctor after work or attend a parenting group for help went unanswered.

Jan Randall, another member of the Department of Children and Family Services' child abuse team, first became acquainted with the Dixons in September 1974. At this time only Barbara and JoJo remained in the Dixon home, Clancy having been voluntarily placed in a foster home in June of that year. During one of Ms. Randall's twice weekly visits, she observed JoJo (then little more than one year old) tied in a potty chair with a white cord and a belt. Joyce Dixon told Ms. Randall that she used the restraints to hold her in the chair.

Both Clarence and Joyce Dixon possessed a rather bizarre view of their children. Ms. Randall testified from a written report she prepared in April of 1975:

"It says when I visited Dixon she was quick to describe her children as different. Couldn't understand why she had to have kids who acted so weirdly. Both parents made statements to me that these kids weren't really theirs. They thought their kids were born. That these creatures from outer space came and took their place. Mr. Dixon stated he had fathered nine other children and none of them acted as these kids do."

Barbara was placed in a foster home in November of 1974. This was the same home in which Clancy had been living since June of that year. Ms. Randall stated that she would visit the foster home weekly to monitor the progress of the Dixon children. She stated that Barbara's behavior improved dramatically while under foster care. She was more calm, deliberate, and considerably less hyperactive than she had been while

living with her parents. She was also more affectionate, and that she had not so been before.

Although it was not until January of 1975 that the Dixons first visited Barbara and Clancy at the foster home, afterwards visits by their children were requested by the Dixons and made a number of times. By the middle of the year it was the opinion of the child abuse team that Joyce and Clarence Dixons' parental skills and attitude toward their children had improved to the point where their children could be returned to them. Consequently, Barbara returned to her parents in July and Clancy returned in October. Ms. Randall left the Department in November of 1976, and did not see the children again until March of 1978 when she had an occasion to be at the foster home.

Garna Dunham was the foster parent with whom the Dixon children lived periodically from 1974 to 1978. Upon arrival at her home from Franciscan Hospital in 1974, Ms. Dunham found Clancy to be uncontrollable. He screamed constantly, and when he was not screaming, sucked his fingers. He also had a number of physical problems. He had a bald spot on the top of his head, and, in Ms. Dunham's words, "rocked back and forth fiercely day and night." The skin on the bottoms of his feet was peeling, and consequently the feet were very sensitive to the touch. His abdomen was bloated, and his legs were atrophied. His bowel movements were not formed.

Ms. Dunham testified that within two weeks to a month after Clancy arrived there was a vast improvement in his condition. He was no longer afraid of being touched, and in fact enjoyed being held and cuddled. He learned to walk in August of 1974, and to talk a short time later.

When Barbara arrived at Ms. Dunham's home in November of 1974, she too was suffering from physical problems. Ms. Dunham stated that she "smelled of urine and stale tobacco smoke. She had a yellow discharge from her vagina. Generally unclean." Ms. Dunham described her talk as "baby jabber." In addition, she, like her brother, screamed repeatedly and had a "wild look" in her eye. She also disliked being touched. Ms. Dunham described Barbara's behavior upon her arrival at length:

> "Then she was very bossy with the other children, very demanding and cussed them. She would clean off the end tables and throw books and magazines in the wastebasket, to the point where I had to set them up on the kitchen tables out of her reach. Okay. She would scream very loudly and then she would laugh. Just in a fiendish-like laugh, that was not a normal four year old laugh. She used profane language to the other children. She would say 'God damn you, you bitch, you fuck hole, and you ass hole'. And I had a very hard time explaining to her she wouldn't talk like

that in our home. And she did overcome it. Barbara folded toilet paper into pads and wore them in her panties. She echoed practically everything anybody else said. And when she wasn't doing that, then she would revert back to the baby jabber. So it was very hard at first to hold a conversation with Barbara or get her attention to hold a conversation with her. She picked at everybody's jewelry, their purses. When visitors would come, she was constantly right on top of them picking at their clothes. And again she had to be corrected for this behavior by removing them [*sic*] from the visitors."

Within a month to six weeks after her arrival at the foster home, Barbara's behavior began to improve. She, like her brother, enjoyed being cuddled.

Ms. Dunham testified that from June 1974 to October 1975 (the first period in which Clancy and Barbara were at the foster home), the Dixons made only one visit to her home, that being in January of 1975. According to Ms. Dunham, the Dixons never called their children on the telephone, nor did they send birthday or Christmas presents to them.

Ms. Irene Gardner, a school nurse employed by the East Moline Public School system, testified that she had contacts with Clancy during the 1975-76 and 1976-77 school years. She stated that in September of 1976 she noticed that Clancy was losing a considerable amount of weight. Because of the weight loss and other physical problems Clancy was experiencing at the time, Ms. Gardner spoke to Mrs. Dixon on several occasions. However, no improvement was made until Clancy was returned to the Dunhams early in 1977.

The testimony of two of Barbara's schoolteachers, Ardith Scott and Kathryn Varlas, was stipulated to by all parties. The essence of their testimony was that when Barbara first attended school in April of 1977, she was aggressive, uncontrollable, and uncooperative. However, after returning to the foster home she became a model student.

Marilyn Wade was then recalled to testify. She stated that in January of 1977 she received a telephone call from Nurse Gardner in regard to Clancy's weight loss. In response she made several attempts to see Clancy at the Dixon home, but was unable to gain entry. Ms. Wade finally was able to visit Clancy with the aid of the East Moline Police. She described Clancy's condition at that time as follows:

"Clancy was, his hair was dirty. He had what you call x-ray eyes. Kind've sunk in his head. Very frightened look. I don't know how to explain the look. Kind've wild, scared. Very thin. To the point where diapers on this four [?] year old boy were just hanging on his hips. He looked sick."

Ms. Wade subsequently took Clancy to a doctor, and filed a petition with the circuit court seeking an order granting the Department of Children and Family Services temporary custody of Clancy. Such an order was entered on January 19, 1977. Although the Dixons knew of the custody hearing, Mr. Dixon did not attend. However, prior to the hearing Ms. Wade had several telephone conversations with Mr. Dixon. During these conversations he indicated a concern about his wife's treatment of JoJo. When Ms. Wade saw JoJo, she was rather thin and had "the same wild look in her eye that Clancy had."

Neva Hamilton, a caseworker for the Department of Children and Family Services, was the next to testify. She was formally assigned to the Dixon case in 1977, and worked with the Dixons during March and April of that year for the purpose of monitoring Joyce's treatment of her youngest daughter. The first time Ms. Hamilton met JoJo (on March 10, 1977) "she was wild. Like an animal that had been left in a cage and let out." On subsequent visits Ms. Hamilton observed JoJo tied in a potty chair for long periods of time (approximately 45 minutes). The last time Ms. Hamilton saw JoJo was the day before she testified. At this time JoJo had been in the foster home for more than a year. Ms. Hamilton stated that "I have never seen so great a change in any child, in all the children I have ever worked with."

Mary Lee Anderson, a nurse in the pediatric department of Franciscan Medical Center, testified that both Clancy and JoJo were uncooperative and belligerent during their stay at the hospital in 1977. In fact, Clancy's condition was similar to his condition upon his 1974 admission.

Jeanna Collings, an employee of the Community Nursing Service in East Moline, worked as a homemaker for the Dixons from August 1977 to January 1978. Her duties as homemaker were to take Barbara and JoJo to the Department's office so they could visit their parents. Ms. Collings testified that Mr. & Mrs. Dixon only attended half of the visits that were scheduled. She further stated that initially JoJo lacked affection for her father, and in fact appeared to be afraid of him.

Dr. Joseph Cress, a clinical psychologist specializing in child psychology, was the next witness to testify on behalf of the State. He examined Barbara in May of 1977 and on the basis of intelligence tests he administered to her found her to be performing "in the range of mild mental retardation." Dr. Cress hypothesized that her retardation could be due to educational and cultural deprivation. He also stated that the home environment is a critical factor in the development of a child, and in Barbara's case classified that environment as "low stimulus, non-structured, with some highly traumatic events." When Dr. Cress re-examined

Barbara in 1978, he found her behavior, as well as her intellectual functioning, to be greatly improved. He further stated that the chances of the improvement being due to environmental change (*i.e.*, Barbara's residence in the foster home) were high. Significantly, a personality evaluation of Barbara taken in 1978 revealed "some indication of conflict with parenting figures." Dr. Cress' testimony in regard to JoJo was very similar to his testimony concerning Barbara. Like Barbara, JoJo's level of intellectual functioning and personal behavior markedly improved after a change in environment.

Lisa Adams, the caseworker currently assigned to the Dixon case, testified that in April of 1977 she received a suspected abuse report regarding JoJo. In response, she went to the Dixon home and asked Clarence and Joyce Dixon if she could see JoJo. The Dixons acquiesced, and Ms. Adams proceeded to follow Clarence Dixon down a hallway. Lisa Adams then testified as follows:

> "So I just stood there and Mr. Dixon went around then into the bedroom, whatever room it was. And maybe about a minute passed and JoJo came out of this room with just a shirt on. And Clarence, her father, followed. And he had what appeared to be bolts in his hands. He was shaking his hands like this. And I asked him, 'Are those bolts, Clarence?' And he said, 'Yes'. And I said, 'Did you have to remove bolts to let JoJo out so that I could see JoJo?' And he said, 'How else are we supposed to keep her confined? We got to do things, you know.' And I said, 'You mean confined JoJo to the potty chair?' And he said, 'How else are we supposed to do things?' And I said, 'Like what kind of things?' And he said, 'Like do the dishes and eat and things like that.' "

Immediately, Ms. Adams took JoJo into temporary custody. Barbara Dixon was removed from the Dixon home several days later.

Barbara and JoJo were returned to Ms. Dunham's foster home in April of 1977. Ms. Dunham testified that when Barbara returned to her home she was much the same as she was in 1974. However, after a while both Barbara's and JoJo's behavior improved.

After the State rested, Clarence Dixon was called upon to testify. For the past 33 years Dixon was employed at the Rock Island Arsenal, and was currently working 48 to 60 hours a week. He had been married twice prior to his marriage to Joyce, and was the father of six children from these marriages. He testified that he and his wife were unable to visit Clancy more than once in 1974 because they did not know where he was living after his discharge from Franciscan Hospital. Apparently he did not try to find out where his son was during this time. After Clancy was placed in the Dunham foster home a second time in 1977, Mr. Dixon did not visit him at all. However, he and his wife did make most of the scheduled visits for Barbara and JoJo.

Mr. Dixon testified that he and his wife faithfully attended Dr. Gennari's group sessions, missing only three or four weekly meetings over a nine-month period. He denied that he actually believed his children came from outer space (in reference to Ms. Randall's testimony) and also denied that he struck his children other than for disciplinary purposes, and then never with much force. He stated he never tied any of his children to chairs, a bed, or a crib. The direct examination concluded after Mr. Dixon testified that during the preceding four-year period he continued to work with the Department of Children and Family Services as best as he could, and in any event, wanted what was best for the children.

Joyce Dixon and Alleda Dixon, Clarence Dixon's mother, were the other two witnesses to testify on the respondents' behalf. Alleda Dixon testified that beginning in 1975 she saw the Dixon children at least once a month. During her visits the Dixon children's behavior was normal, and Mr. and Mrs. Dixon exhibited affection toward them.

Only two issues are raised in this case on appeal from the order terminating Clarence Dixon's parental rights and appointing the guardianship administrator of the Department of Children and Family Services to consent to the adoption of the three minor Dixon children. First, did the State fail to prove that the father of the Dixon children was an unfit parent; second, even if the State has proven the father to be an unfit parent, did the court nevertheless err in terminating his parental rights?

Section 1D of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501D) provides in pertinent part:

"D. 'Unfit person' means any person whom the court shall find to be unfit to have a child sought to be adopted, the grounds of such unfitness being any one of the following:
✽ ✽ ✽

(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;
✽ ✽ ✽

(d) Substantial neglect of the child if continuous or repeated;
(e) extreme or repeated cruelty to the child;
✽ ✽ ✽

(g) Failure to protect the child from conditions within his environment injurious to the child's welfare;
✽ ✽ ✽ "

The unfitness of a parent under any of these grounds must be proven by clear and convincing evidence (*In re Love* (1977), 50 Ill. App. 3d 1018, 366 N.E.2d 139; *In re Hrusosky* (1976), 39 Ill. App. 3d 954, 351 N.E.2d 386). "Clear and convincing evidence means proof which should leave no reasonable doubt in the mind of the trier of the facts concerning the truth

of the matter in issue." *(In re Jones* (1975), 34 Ill. App. 3d 603, 607, 340 N.E.2d 269, 273.) The respondent father contends that although the trial court did in fact utilize the "clear and convincing evidence" burden of proof, it considered the evidence required to meet this burden to be less than that required to meet the "beyond a reasonable doubt" standard, and therefore the trial court's application of the clear and convincing evidence standard was erroneous. We find the respondent's argument on this point to be without merit. In discussing the applicable burden of proof to be used in determining whether a parent is unfit under section 1D of the Adoption Act, the trial court stated:

> "The standard has been expressed that it should be by clear and convincing evidence. I think probably this is the court standard. One court has apparently interpreted that to mean beyond a reasonable doubt, which is the standard in criminal cases. I am not sure it is correct to say beyond a reasonable doubt. *But clear and convincing evidence would mean something substantially equivalent to that. To proof beyond a reasonable doubt.* It may not be quite as high a standard, but it would certainly be more than just a probability." (Emphasis added.)

This court has previously held that the correct burden of proof to be used in proving the unfitness of a parent is clear and convincing evidence. (*Love; Hrusosky.*) The court was not in error when it applied this standard to the facts presented at the hearing. In addition, although the trial court noted the difference between proof beyond a reasonable doubt and clear and convincing evidence it did find these standards to be "substantially equivalent." We cannot say that as a matter of law the burden of proof used by the trial court in the instant case was improper.

Was the evidence presented to prove that Clarence Dixon was an unfit parent clear and convincing? The trial court's determination in this regard should not be disturbed unless contrary to the manifest weight of the evidence. (*In re Adoption of Kleba* (1976), 37 Ill. App. 3d 163, 345 N.E.2d 714.) In regard to Clancy, the trial court found by clear and convincing evidence that Clarence Dixon was an unfit parent because he failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare; substantially and continually neglected Clancy; subjected Clancy to extreme and repeated mental cruelty; and failed to protect him from conditions within his environment injurious to his welfare (Ill. Rev. Stat. 1977, ch. 40, pars. 1501D (b), (d), (e), (g)). In regard to Barbara, the court found that Mr. Dixon was an unfit parent because he substantially and repeatedly neglected her, and failed to protect her from conditions in her environment injurious to her welfare (Ill. Rev. Stat. 1977, ch. 40, pars. 1501D (d) & (g)). The court also found the latter to be grounds on which Mr. Dixon was proven to be an

unfit parent in regard to JoJo. The court additionally found that he had been extremely and repeatedly cruel to her (Ill. Rev. Stat. 1977, ch. 40, par. 1501D(e)).

■■ On the basis of the evidence we have presented, we are of the opinion that the trial court's determination that Mr. Dixon was an unfit parent was not against the manifest weight of the evidence. There can be no dispute that all three of the Dixon children were suffering from various degrees of mistreatment and neglect while in the custody of their parents. The environment of the Dixon home presented the Dixon children with little more than a host of physical and psychological problems that were cured only by removal to a foster home.

The respondent father, as the State points out, makes a concerted effort to place the blame for the children's condition while at their home on his wife. The respondent argues that at least he tried to make things better for Clancy, Barbara, and JoJo, and therefore he cannot be classified as an unfit parent. However, the Adoption Act provides that if the evidence shows clearly and convincingly that the parent failed "to protect said minor from conditions within his environment injurious to his welfare," that *alone* is sufficient to prove the parent unfit (Ill. Rev. Stat. 1977, ch. 40, par. 1501D(g)). Mr. Dixon knew very well that his children were being mistreated and neglected by his wife. He expressed concern to a number of people (Dr. Gennari and Marilyn Wade, for example) for his children's welfare. Unfortunately, this concern never evolved into purposeful action to remedy the situation at the Dixon home. If anything, his failure to take an active role in improving the home environment compounded the physical and psychological trauma experienced by his children. Although there is circumstantial evidence of actual mistreatment by Clarence Dixon, we feel the type of passive neglect he exhibited toward his children is sufficient to render him unfit.

■■ The respondent's second argument is that even though he may have been proven to be unfit by clear and convincing evidence, it was an abuse of discretion to terminate his parental rights. "In an adoption proceeding, the relief sought cannot be awarded solely on the basis of what is in the best interests of the child." (*In re Jones* (1975), 34 Ill. App. 3d 603, 607, 340 N.E.2d 269, 273.) "However, where as here, there is clear and convincing evidence of the unfitness of a natural parent, then the natural right of the parent must yield to the best interest of that child." *In re Adoption of Kleba* (1976), 37 Ill. App. 3d 163, 167, 345 N.E.2d 714, 718.

In our opinion the termination of Clarence Dixon's parental rights is in the best interest of the Dixon children. We see absolutely no benefit in returning custody of the three children to an individual who has so little regard for his parental responsibilities. In addition, a decision by this court returning the children to the father would also result in returning the

children to the mother, as there is no evidence that the Dixons are now no longer living together. A return to that environment can only be regarded as detrimental to the physical and psychological growth and development of the Dixon children. The court did not err in terminating Mr. Dixon's parental rights.

The order of the Circuit Court of Rock Island is affirmed.

Order affirmed.

ALLOY and SCOTT, JJ., concur.