*In re* WILLIAM DALTON *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* KAREN DALTON, Respondent-Appellant.)

Second District    No. 80-820

Opinion filed July 31, 1981.

Alex Rafferty, III, of Waukegan, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Paula R. Johnson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE REINHARD delivered the opinion of the court:

This is an appeal by respondent, Karen Dalton, from an order finding her and Lawrence Dalton unfit parents and terminating their parental rights in their natural children, William Dalton and Cheryl Lynn Rugg. The issue presented for our review is whether the evidence presented to the trial court was sufficient to find the children neglected and the respondent, Karen Dalton, an unfit parent whose parental rights should be terminated.

The procedure involved in the termination of parental rights involves provisions of both the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 701—1 *et seq.*) and the Adoption Act. (Ill. Rev. Stat. 1979, ch. 40, par. 1501 *et seq.*) First, there must be a finding of neglect and the child must be adjudged a ward of the court pursuant to the Juvenile Court Act. The Act defines neglect in the following manner:

"(1) Those who are neglected include any minor under 18 years of age

(a) who is neglected as to proper or necessary support, education as required by law, or as to medical or other remedial care recognized under State law or other care necessary for his well-being, or who is abandoned by his parents, guardian or custodian; or

(b) whose environment is injurious to his welfare or whose behavior is injurious to his own welfare or that of others.

(2) This Section does not apply to a minor who would be included herein solely for the purpose of qualifying for financial assistance for himself, his parents, guardian or custodian." (Ill. Rev. Stat. 1979, ch. 37, par. 702—4(1)(b).)

In an amended petition it is alleged here that the minors were neglected by reason of the following facts:

"COUNT II

The minors are neglected in that they are persons under the age of 18 years whose environment is injurious to their welfare by reason of the following:

(a) The minors' father, Lawrence Dalton, is a convicted felon, and unfit as a parent, having been convicted of Murder, Kidnapping and Sexual Assault in the State of Wisconsin.

(b) The minors' father, Lawrence Dalton, has threatened the minors and beaten them.

(c) The minors' father, Lawrence Dalton, has choked Barbara Filipski until she fainted and has pointed guns to the head of Barbara Filipski and Karen Dalton, while in the presence of the minors.

(d) The minors' father, Lawrence Dalton, played 'Russian Roulette' with the minors, pointing a loaded gun at the head of the minors and pulling the trigger.

(e) The minors' mother, Karen Dalton, being aware of the facts, alleged in subsections b, c, & d, and being aware of the facts leading to the convictions of Lawrence Dalton, as stated in subsection (a), did nothing to protect the minors from the dangers of their environment, and acquiesced in the creation and maintenance of said injurious environment.

(f) That the minors' mother, Karen Dalton, has engaged in prostitution, adultery, and homosexual activity, and has worked as a nude dancer, thereby making her unfit to be a mother.

## COUNT III

The minor, William Dalton, a person under the age of 18 years, is neglected in that his behavior is injurious to his welfare by reason of the following:

(a) He attempted suicide on May 27, 1979.

(b) He attempted suicide on May 28, 1979.

## COUNT IV

The minor, Cheryl Lynn Rugg, a person under the age of 18 years, is neglected by reason of the following:

(a) She bangs her head against the wall.

(b) She has several temper tantrums per week, lasting as long as three hours."

Although it also was alleged that the children were dependent minors (Ill. Rev. Stat. 1979, ch. 37, par. 702—5), the trial court specifically found them not to be dependent minors and, therefore, that is not an issue before us on appeal.

The Act further provides that a guardian with the power to consent to an adoption may be appointed if the court makes the further finding that a nonconsenting parent is unfit and it is in the best interest of the child that a guardian of the person be appointed and authorized to consent to the adoption of the minor. Such an order works to terminate all parental rights of the unfit parent and relieves him of all parental responsibility. (Ill. Rev. Stat. 1979, ch. 37, par. 705—9(2).) The definition of "unfit person" is provided in the Adoption Act. The parties have agreed that the applicable statutory provision under which the State has proceeded is subparagraph (g) of section 1D, which states that an unfit person is one who fails "to protect the child from conditions within his environment injurious to the child's welfare." (Ill. Rev. Stat. 1979, ch. 40, par. 1501D(g).) While the State's amended petition does not expressly allege

unfitness under this subparagraph, the trial court based its findings on this provision and the respondent does not contend otherwise on appeal.

Generally, the issues of neglect and unfitness are determined in separate proceedings (*In re Prough* (1978), 61 Ill. App. 3d 227, 231, 376 N.E.2d 1078), and we deem that to be the better procedure. Here the State's amended petition contained allegations of both neglect and unfitness and prayed for a termination of parental rights. However, hearings were consolidated into a single proceeding pursuant to agreement of the parties. Additionally, the court also heard evidence on a petition filed "In the Interest of Theresa Dalton," who was a child of Lawrence Dalton and one Barbara Filipski. In a separate appeal, Barbara Filipski also seeks review of the trial court's order finding Theresa Dalton a neglected child and terminating the parental rights upon a finding of unfitness.

The evidence adduced at the hearing disclosed the following facts. Respondent had lived with Lawrence Dalton for seven years and had been married to him for the last three years prior to the June 9, 1980, hearing. William Dalton, who was born November 24, 1973, and Cheryl Lynn Rugg, who was born April 4, 1976, are their natural children. During several of those years Barbara Filipski cohabited with the Daltons, moved with them to various places and bore one child of Lawrence Dalton. The trial court took judicial notice of the fact that Lawrence Dalton is a convicted murderer and is presently serving a life sentence in a Wisconsin penitentiary.

Linda Capp, an employee of Central Baptist Family Services, testified that she had a conversation with respondent on June 14, 1979, in which respondent told her that Lawrence Dalton had stuck a gun to her head in the presence of her children, that once he made the children stay out on the streets for 24 hours straight until they brought home enough money for him, and that he would threaten to harm her family if she would leave. Respondent further told Capp that she had been forced by him to become a prostitute and that she felt compelled to stay with Dalton for fear of harm to the children.

Next, in a tape-recorded interview which was admitted into evidence, Karen Dalton stated that she had helped her husband dispose of a large box which contained the dead body of a girl named Shirley Taylor by throwing it into the Fox River. She further stated that she did not know that the box contained the body until she read in the newspaper that the police had found it. However, after learning that her husband had killed the girl, she continued to live with him and accompanied him on a trip to New York.

In the same interview, respondent admitted to learning of another murder which her husband had committed. Respondent stated that while

she and her husband were living in New York, he told her that he had murdered a woman named Blanche Penna and buried her body in front of a house at 12600 Sheridan Road, Kenosha, Wisconsin.

Respondent also stated in the interview that her husband had threatened the children and had held a gun to the heads of both of them, that he had hit William in the mouth and that he had tried to run over another child because respondent was trying to take the child away. She further stated that Dalton frequently picked up female minors and brought two of them back to their home. Also, during part of the time they lived together, Barbara Filipski lived with them, and Dalton fathered her child.

Karen Dalton was called by the State pursuant to section 60 (Ill. Rev. Stat. 1979, ch. 110, par. 60), and on direct examination, respondent corroborated the fact that she had worked as a prostitute in 1977 and that Lawrence Dalton had forced her to have sex with other women. She also stated that on several occasions she lived apart from Dalton and took the children with her. She further testified that her husband had threatened the children and had pointed a gun at her son's head and that he threatened to kill the child if respondent did not stay with him. She also said that her husband beat both of the children and played Russian roulette with them.

Bonnie Lou Hastings, a licensed foster parent who had been the guardian of Cheryl Lynn Rugg since July 1979, also testified. Hastings stated that when Cheryl came to live with her, the child was very despondent and self-abusive. Hastings stated that Cheryl would injure herself "[b]y putting her finger up her nose, and choking herself, kicking herself, banging her head, and throwing her body across the room and against doors." The witness testified that Cheryl still had temper tantrums during which she would scream and bang her head against the wall.

Ruth Ann Hereen, the foster mother of William Dalton since May 11, 1979, then testified. Hereen stated that William didn't have any self-control and had made two attempts at suicide since he had been living with her. Once William placed an electric drill in his mouth, and, on another occasion, he attempted to step out of a moving vehicle and stated that he just wanted to kill himself.

Dr. Gloria Berkwits, a psychiatrist with a subspecialty in child psychiatry, had examined both William Dalton and Cheryl Lynn Rugg and testified at the hearing as to her evaluations of the children. Berkwits indicated that William was totally unable to talk about his father and said very little about his mother. Berkwits stated that this type of response indicated that William did not feel comfortable with his natural parents and that William gave her the impression that he seemed to prefer living

with his foster parents. In her opinion, William was not able to deal with generalities or abstract concepts, which is indicative of children who have some brain disfunction. His conduct would not be caused from single, isolated incidents. Cheryl was also unable to talk about her father and could speak only indirectly about her mother. Dr. Berkwits was of the opinion that "without significant psychotherapy she is going to have many, many problems in the future in terms of being able to relate to people at all and trusting anybody." Berkwits concluded that they both were damaged children and that "to reverse some of that damage they would need a much more normative kind of life setting with a two-parent family who can get along in a loving relationship as opposed to what I have to label [a] sadomasochistic kind of relationship."

Barbara Dells, a therapist with Central Baptist Family Services, testified that she interviewed William on July 1 and 4, 1979, to make a diagnostic assessment in view of his two suicide attempts. William related fears about being beaten up and expressed bizarre ideas. Dells did not render an opinion on William's behavior as there was an objection by respondent.

Another psychiatrist, Dr. Howard Klapman, also examined William on June 5, 1979, and again several months before the hearing. It was Dr. Klapman's testimony that after the first interview he concluded that William needed to be in a "structured, reasonably calm environment." However, William appeared much happier at the second interview, was getting along reasonably well, there was no major evidence of pathology and he was not in need of therapy.

Prior to the presentation of respondent's first witness, a 1½-page letter from Betsy Freschl, a psychotherapist with the Family Service Association of Dundee Township, was admitted into evidence by stipulation. Freschl stated in the letter that she had met with Karen Dalton on six occasions for therapy and counseling. Freschl stated that respondent was conscientious about keeping her appointments and paying the agreed upon fee. The letter further indicated that respondent was employed and living in a suitable environment, was cooperative and sincere in her counseling effort, and had shown a genuine interest in improving the quality of her life.

During the presentation of respondent's evidence, Karen Dalton was again called for direct examination. Respondent testified that she had never harmed either one of her children and that she was aware of her husband's physical abuse of the children but all her efforts to prevent it failed. Respondent further stated that her husband would threaten the lives of the children to prevent her from leaving him. She had contacted the police about her husband's conduct but stated that they refused to

become involved in a family matter. Respondent indicated that she wanted her children back and could take care of them.

Later during the presentation of respondent's case, Beverly Napier, a neighbor of the Daltons, testified. Mrs. Napier stated that she had never seen Karen Dalton abuse either of her children. Mrs. Napier further indicated that Karen Dalton's attempts to leave were frustrated by her husband's threats to kill the children. Napier stated that "[w]henever they did leave and get away, he would kidnap the kids back." Mrs. Napier's husband, Arthur Napier, also testified that he witnessed Lawrence Dalton hold one of the children outside of the third floor window and threaten to drop him in order to coerce respondent into remaining with him. He further stated that on one occasion Dalton tried to run the children over with a car, and, on another, Dalton threatened to kill them. The witness had never seen the children have temper tantrums or beat their heads against a wall.

After final arguments were heard, the court entered an order finding the children, Cheryl Lynn Rugg and William Dalton, to be neglected and finding both Lawrence and Karen Dalton to be unfit parents in that they failed to protect the children from conditions within their environment injurious to their welfare. The court found it in the best interests of the children to terminate the parental rights of both Lawrence and Karen Dalton. Karen Dalton now appeals from this order.

■■ ■ It is patently clear from the record in this case that the children were severely neglected. Neglect is not a word of fixed meaning, and its meaning necessarily varies with the circumstances of each case. (*In re Principato* (1978), 65 Ill. App. 3d 706, 709, 382 N.E.2d 662.) Cases involving the welfare of children are *sui generis* and must be judged on their particular facts. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 337, 379 N.E.2d 872.) The trial court has broad discretion in deciding child neglect cases; its decision will be overturned on appeal only when the challenging party shows either that the trial court has abused its discretion, or that the decision is contrary to the manifest weight of the evidence. (*In re Stilley* (1977), 66 Ill. 2d 515, 520, 363 N.E.2d 820; *In re Jackson* (1980), 81 Ill. App. 3d 136, 138, 400 N.E.2d 1087.) The facts in the present case disclose that the children were beaten, threatened with guns, and subjected to numerous other forms of physical and psychological abuse over a long period of time. As a result of this abuse and their environment described above, both children exhibited serious self-destructive tendencies and personality problems. Such evidence shows beyond the slightest doubt that the children were indeed neglected as set forth in the amended petition, and the lower court's finding of neglect will not be disturbed upon appeal.

■■ Respondent's contention that the children were not neglected because

she was free from any personal neglect or abuse of them is wholly lacking in merit. Even if respondent had made every effort to protect the children from her husband's dangerous proclivities, the children must still be adjudged neglected. The statutory definition of neglect clearly requires the court to focus on the child's environment in order to determine if the child is receiving the necessary care. It embraces wilful as well as unintentional disregard of duty. (*In re Stilley* (1977), 66 Ill. 2d 515, 520, 363 N.E.2d 820.) Neglect is the failure to exercise the care that the circumstances justly demand. (*People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 624, 104 N.E.2d 769.) As the court in *In re Gates* (1978), 57 Ill. App. 3d 844, 849, 373 N.E.2d 568, explained, "Section 2—4 clearly requires the court to determine whether a child is neglected, that is, whether the child is receiving the care necessary for his well being, and not necessarily whether the parents have been neglectful."

■■ Similarly, there cannot be much question about the respondent's "unfitness" under these facts. In order to justify the termination of parental rights, the finding of unfitness must be supported by clear and convincing evidence (*In re Powers* (1981), 94 Ill. App. 3d 646, 648, 418 N.E.2d 1145, 1147), and such finding should not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *In re Gates* (1978), 57 Ill. App. 3d 844, 853, 373 N.E.2d 568.

■■ Respondent, however, suggests that she should not be adjudged an unfit parent because she did everything possible to protect her children. Respondent, in effect, argues that the court should not consider the success of her efforts but merely the fact that efforts were made. This question is controlled by the holding in *In re Tolbert* (1978), 62 Ill. App. 3d 927, 378 N.E.2d 565, in which, like the case at bar, the trial court found a parent unfit by her failure to protect the children from conditions within their environment injurious to their welfare. The court in *Tolbert* held that the determinative factor in a finding of unfitness pursuant to subparagraph (g) should be the results of any efforts made to protect the children rather than the mere fact that an effort was made. The court stated:

> "To us, as to the trial court, the primary, perhaps the sole, issue in the determination of respondent's fitness as a parent is the health of her children. This problem is reflected in their malnutrition and their worm infestations which are the product of unsanitary conditions. It is readily conceded by all involved that Marie Tolbert loves her children and has never abused them. Nevertheless, we must hold that the record discloses clear and convincing evidence that she failed to protect the children from conditions in their environment which are injurious to their welfare." 62 Ill. App. 3d 927, 930, 378 N.E.2d 565.

Although other Illinois cases have stressed the importance of a parent's efforts to carry out parental responsibilities rather than the success of their efforts, these cases were not brought under subparagraph (g) of section 1D of the Adoption Act (Ill. Rev. Stat. 1979, ch. 40, par. 1501D). (See, *e.g.*, *In re Hurley* (1976), 44 Ill. App. 3d 260, 265, 357 N.E.2d 815, and *In re Taylor* (1975), 30 Ill. App. 3d 906, 909, 334 N.E.2d 194; but see *In re Brown* (1980), 87 Ill. App. 3d 1074, 410 N.E.2d 486.) The reasoning of these decisions was distinguished by the *Tolbert* court in the following persuasive manner:

> "Respondent contends that *In re Hurley*, 44 Ill. App. 3d 260, 357 N.E.2d 815 (2d Dist. 1976), and *In re Taylor*, 30 Ill. App. 3d 906, 334 N.E.2d 194 (1st Dist. 1975), stand for the proposition that the focus of our inquiry should be not on the success of her efforts but rather on the fact that she did try. We see no application of those cases to the present case. In *Hurley* and *Taylor* the efforts in question were to contact children in the custody of foster parents and the efforts were frustrated by the Department of Children and Family Services and others. In other words, the failure to make contact or visit the children was held not to be indicative of a lack of interest. In the area of health, however, results are paramount. Whatever the reason, upon review of the evidence, it cannot be denied that Marie Tolbert failed to protect her children's health." (62 Ill. App. 3d 927, 930-31, 378 N.E.2d 565.)

In the case at bar, like the *Tolbert* case, we are more concerned with the physical and psychological health of the children than any lack of interest on the part of the respondent. As the psychiatric testimony and other evidence clearly demonstrated, the children suffered from conditions within their environment which were injurious to their welfare. It can only be concluded that the respondent failed to protect them in this regard.

Even if the focus of this inquiry were to be upon the respondent's effort rather than success, the record does not reveal sufficient facts to warrant a reversal on the issue of fitness. Respondent's basic "defense" for not removing her children from the dangerous environment created by Mr. Dalton was that to do so would have endangered her life and the lives of her children. Although the record shows that Mr. Dalton made numerous threats to this effect, we believe that an adequate opportunity to flee could have presented itself within the seven-year period that respondent lived with Mr. Dalton. In fact, by respondent's own admission, during this seven-year period, she and her children had lived apart from Dalton several times, but she continually chose to return to him. On one occasion, after reading in the newspaper of her husband's murder of a young woman, respondent still drove to Indiana in order to be with him.

The trial court specifically noted and rejected respondent's "defense of fear," stating:

> "In the court's opinion, considering the lengthy periods of time and having heard the testimony, feels that it is not reasonable or credible when one considers that time element and the different geographical locations over which it took place. The court feels that one would have to be devoid of almost all reason to have that be credible * * *."

It does not appear that this was an unreasonable conclusion nor that it was against the manifest weight of the evidence.

■■ Respondent's failure to remove the children from this injurious environment is analogous to the situation in *In re Dixon* (1980), 81 Ill. App. 3d 493, 401 N.E.2d 591, which was also brought under 1D(g). In reaching its holding, the court equated the father's "passive neglect" with parental unfitness. The court stated:

> "The respondent father, as the State points out, makes a concerted effort to place the blame for the children's condition while at their home on his wife. * * * However, the Adoption Act provides that if the evidence shows clearly and convincingly that the parent failed 'to protect said minor from conditions within his environment injurious to his welfare,' that *alone* is sufficient to prove the parent unfit (Ill. Rev. Stat. 1977, ch. 40, par. 1501D(g)). Mr. Dixon knew very well that his children were being mistreated and neglected by his wife. He expressed concern to a number of people * * * for his children's welfare. Unfortunately, this concern never evolved into purposeful action to remedy the situation at the Dixon home. If anything, his failure to take an active role in improving the home environment compounded the physical and psychological trauma experienced by his children. Although there is circumstantial evidence of actual mistreatment by Clarence Dixon, we feel the type of passive neglect he exhibited toward his children is sufficient to render him unfit." (81 Ill. App. 3d 493, 503, 401 N.E.2d 591.)

In the case at bar, the respondent was guilty of a much more serious form of passive neglect in failing to remove the children from their obviously dangerous environment. Accordingly, we reject respondent's contention that she "did everything in her power to protect and remove the minors from an injurious environment." We, therefore, refuse to hold that the trial court's finding of unfitness was against the manifest weight of the evidence.

■■■ Respondent also contends that even if she was proven to be an unfit parent, the trial court should have exercised an option less drastic than the

complete termination of her parental rights. Once there is clear and convincing evidence of the unfitness of the natural parent, the natural right of the parent must yield to the best interest of the child. (*In re Adoption of Kleba* (1976), 37 Ill. App. 3d 163, 167, 345 N.E.2d 714.) The options available to the trial court short of complete termination of parental rights are contained in section 5—7(1) of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 705—7(1)). The decision to terminate parental rights rests within the sound discretion of the trial court and the appellate court should not interfere with its judgment absent an abuse of discretion. *In re Gates* (1978), 57 Ill. App. 3d 844, 853, 373 N.E.2d 568.

Respondent has presented no evidence of her current living conditions and her present relationship with her children that would even suggest that she is now better suited to handle the responsibilities of parenthood. The fact that Lawrence Dalton has been removed from the situation and is serving a life sentence on a murder conviction does not absolve respondent from her own inability to properly care for her children nor should it automatically require return of the children to her.

The psychiatric testimony presented in this case conclusively established that the children had suffered grievous physical and psychological harm while residing with respondent and Mr. Dalton. The result of this abuse manifested itself in the self-destructive tendencies of Cheryl and in the two suicide attempts by William. Neither child was able to speak directly about their mother, and Dr. Berkwits stated that this indicated that they did not feel comfortable with her. Berkwits also stated that William seemed to prefer living with his foster parents as opposed to returning to his previous environment. It was the opinion of both psychiatrists who testified that the children needed a more secure and normative type of environment than that to which they had been previously exposed. In fact, Dr. Klapman testified that William's condition had improved during the time he had been living with his foster parents.

The letter from Betsy Freschl was the only evidence presented which even vaguely related to respondent's efforts to improve the quality of her life. However, that letter contained no mention of respondent's rehabilitative potential, her interaction, if any, with her children since their placement in a foster home, nor of her actual capacity to function as a responsible parent in view of the children's emotional problems.

■■ In light of the previously mentioned evidence in this case and the almost complete lack of any evidence which might tend to show that respondent has improved her ability to protect and care for her children, we can only conclude that there would be absolutely no benefit in returning these children to a mother who has exhibited such little regard

914

for her parental responsibilities. (See *In re Dixon* (1980), 81 Ill. App. 3d 493, 503, 401 N.E.2d 591.) We feel that the evidence more than sufficiently justified the trial judge's conclusion that termination was in the best interest of the children. Accordingly, the judgment of the trial court is affirmed.

Affirmed.

LINDBERG and UNVERZAGT, JJ., concur.