165 Ill. App.3d 112 (1988)
518 N.E.2d 691
In re R.G. et al., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Estella Daniels, Respondent-Appellant).
No. 2-86-1136.
Illinois Appellate Court  Second District.
Opinion filed January 11, 1988.
*113 *114 Bernard H. Shapiro, of Prairie State Legal Services, Inc., of Rockford (David H. Taylor, of counsel), for appellant.
Paul A. Logli, State's Attorney, of Rockford (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of Elgin, and John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Prosecutor's Office, of Ottawa, of counsel), for the People.
Judgment affirmed.
JUSTICE UNVERZAGT delivered the opinion of the court:
The respondent, Estella Daniels, mother of R.G. and B.D., a male and female minor, respectively, appeals from the orders of the circuit court of Winnebago County finding each minor to be abused, finding her to be an unfit person, terminating her parental rights, and appointing *115 the Department of Children and Family Services (DCFS) as the children's legal guardian with the power to consent to adoption. Neither Vernon Daniels, B.D.'s father and R.G.'s stepfather, nor Bobby Powers, R.G.'s alleged natural father, are parties to this appeal. We note the respondent's contemporaneous appeal from her criminal conviction for aggravated criminal sexual assault against R.G., which involved some of the same conduct alleged in the instant cause, has been affirmed by this court. People v. Daniels (1987), 164 Ill. App.3d 1055.
Respondent contends: (1) she received ineffective assistance of counsel; (2) the court erred by conducting a combined adjudicatory, dispositional, and termination hearing; (3) the court erred in not allowing her to be present during the testimony of her children; and (4) the court's finding of parental unfitness was not supported by clear and convincing evidence.
We sua sponte find respondent's statement of facts is argumentative with regard to the issue of whether she received the effective assistance of counsel and is otherwise insufficient to convey an understanding of the case as required by Supreme Court Rule 341. (107 Ill.2d R. 341(e)(6).) As stated in Midland Hotel Corp. v. Reuben H. Donnelley Corp. (1986), 149 Ill. App.3d 53, 57, "attorneys can properly present evidence that is favorable to their clients but not at the cost of this court's understanding of the case." The respondent's statement of facts will not be stricken, however, and, as in Midland, these comments are intended both as chastisement and warning.
Over objection of counsel for Vernon Daniels and counsel for respondent, the court granted the State's request to have its petitions for adjudication, the dispositional hearing, and its request for termination of parental rights heard at the same time. The hearing began on November 3, 1986, and was continued once to November 24. After examining R.G. in chambers in the presence of the children's appointed guardian ad litem (GAL), the court granted the State's motion, over respondent's and Vernon's objections, to receive R.G.'s testimony in chambers out of respondent's presence.
On direct examination, R.G. defined "family touching" as he, his sister, his mother and stepfather, Vernon Daniels, touching each other's genitals. R.G. would have sex with his mother and B.D. by putting his penis in their vaginas; he would have sex with Vernon by Vernon putting his penis in R.G.'s "butt." "Family touching" happened about every week, and it began when he was eight years old. Vernon would also place R.G.'s hand over Vernon's penis in a circle around his penis and then move R.G.'s hand back and forth; if R.G. *116 did this for a long time "white stuff" would come out, but if for a short time it did not.
In R.G.'s presence, B.D. would move her hand back and forth on Vernon's penis. Over respondent's objection, R.G. testified B.D. told him she and the respondent played with a penis-like thing which R.G. had seen under his mother's pillow. He said his mother and Vernon took five or six movies of him. In the last one, R.G., B.D., the respondent, Vernon and Duker, their dog, were present. Vernon was doing the filming; R.G. masturbated the dog's penis, the dog licked R.G.'s penis, and R.G. put his penis in the dog's "butt." Vernon and the respondent were directing R.G.'s actions with the dog.
The other movies were just like "family touching." R.G. stated his mother did filming when Vernon and B.D. were having intercourse. In one movie, Vernon had a bull whip and whipped it at him and B.D.; once in a while the whip would hit them, but usually it missed. Sometimes in the movies he and B.D. got slapped or punched by Vernon and their mother. He didn't remember if anything sexual happened in the movies in which he was slapped and whipped. R.G. testified that once or twice his maternal grandparents, Clara and Dave Ginger, would be present at the filming and would hold the camera. His grandparents never did anything sexual to him, but they would punch and kick B.D. and him.
R.G. testified Tim B. lived a couple houses away from R.G.'s grandparents. He did not know how old Tim was. R.G. testified Tim B. sexually abused him in Tim's backyard shed; R.G. told his grandparents about this, but they would not listen. R.G. testified that when his uncle died and B.D. and his mother went to Peoria on July 28, 1985, he was alone with Vernon. R.G. testified Vernon had anal intercourse with him on that day; it was a Sunday, and it happened in Vernon's bedroom.
On cross-examination by counsel for Vernon, R.G. admitted he did not tell anyone in authority right away about Vernon's having intercourse with him. He also admitted he had stated to the authorities that various neighbors had sexually abused him, but that it was not true. R.G. stated it also was not true that his mother or his parents had killed someone. The camera used made films that were shown on a projector; he admitted it was untrue that Vernon transferred film so it could be played on their "RCS" movie player. R.G. stated he first said nothing happened when he came into foster care because his parents told him that if he told, they would come after him and hurt him. He remembered the statement he made to police on October 11, 1985; the incident related therein in which Vernon was in the kitchen and *117 made R.G. have anal intercourse with him occurred on July 28, 1985; the other incident of anal intercourse in the bedroom was on another date.
R.G. stated that sometimes he and boys named Chris and Justin would go out in a cornfield and look at magazines depicting nude people doing sexual things. R.G. stated that he and a boy named Louie had sex with B.D. in the cornfield on one occasion in 1985. He got the magazines from under his parents' bed. His parents did not know that he took them until a neighbor, Mrs. Long, found out, and that same day he and B.D. were taken into foster care.
On cross-examination by counsel for respondent, R.G. stated he had sex with Tim B. possibly four times. On those occasions, Tim, who was "a lot older" than R.G., "almost 20," would put his penis in R.G.'s "butt" and then R.G. would put his penis in Tim's "butt." When Tim's sister, Brandy, was not at home, B.D. played with Tim and R.G. one time. His relationship with Tim started about the same time the "family touching" did.
R.G. never saw any of the movies that were made. He did not know if the movies were ever taken to be developed. R.G. stated Vernon has two bull whips; they were hung on the deer head that they have in their home. Their dog, Duker, was part German shepherd and part collie and was about 10 years old. The movie R.G. made with the dog was made when R.G. was 11 years old. R.G. stated his grandparents filmed them on one occasion; they didn't kick or punch them at that time, but on a few other occasions they would do so.
R.G. stated he changed his mind about telling about what had happened because he began to know he was safe and began to understand that the assistant State's Attorneys and the other attorneys don't punch kids. He admitted he told some lies along with the truths. R.G. stated when he had contact with his mother while he was in foster care, she would tell him that he had better not tell anything. He was mad at his mother only because of the things that she did to him; otherwise, he always liked his mom.
On cross-examination by the GAL, R.G. stated the things that happened to him happened in Rockford, and that nothing in his testimony that day was a lie; he knew the difference between a lie and the truth. He lied about things in the past because he was confused and trying to cover up for his mother. His parents told him he would go to jail if he told about it because he had gone along with it. R.G. stated he does not feel now that any of it was his fault, but that he did feel that way before and he felt guilty about it.
R.G. stated his parents showed him about one-half of an X-rated *118 movie showing people that just got married and about how to have sex. He stated his parents would not be there when his grandparents hit and kicked him, but that he thought they knew about it because his parents and grandparents talked a lot. R.G. stated the penis-like object vibrated when it was plugged into the wall. His mother never told him what she did with the movies after she and Vernon took them. R.G. stated his parents showed him Playboy, Chic and Hustler Magazines; his father told him he should read about these things because they were going to have some fun things like in the magazines. R.G. stated that when his parents wanted to do those things, they would tell him and his sister to remember about the magazines. When R.G. saw a movie with his mother in which a boy was licking a dog's penis and playing with the dog, R.G. stated he did not believe that could happen, and his mother sat their dog on the bed and told R.G. to take down his pants and the dog would lick his penis.
R.G. stated there was a light mounted on the camera they used to take movies. R.G.'s parents had a projector, and R.G. thought the movies they took fit that projector. He had not seen and did not know if his parents could develop the film. R.G. stated he never told his parents about B.D. having sex with Tim B. or Louie. He did not know if the movies had been given names, and he never heard his relatives talk about the movies.
On redirect examination, R.G. said the last time he saw the projector was in court the Wednesday before. On re-cross-examination by respondent's attorney, R.G. stated he did not see the movies or bull whip at the trial, but he did see the penis-like vibrator.
Upon inquiry by the court, R.G. stated Tim B. put his penis in B.D.'s vagina. R.G. did not do anything to make his grandparents angry, which would have caused them to kick or punch him. In one movie, there was no sex, but just pictures of Vernon and the respondent hitting R.G. and his sister. He first started seeing the magazines when he was about 10 or 11, after the "family touching" began. Examination of R.G. then concluded. After recess, and based on his interview with B.D. in chambers in the presence of the GAL, the court granted the State's motion over Vernon's and respondent's objections to examine B.D. out of the presence of her parents.
B.D. testified that "family touching" meant when people have sex with their kids and have them touch with their hands you and your mom's and your dad's private parts. B.D. said the touching took place at her house with her mother, father, brother and herself present. She said she would touch her mother's vagina with her hand for a long time. Her parents told her to touch R.G.'s penis, and R.G. would *119 touch her vagina with his hand. B.D. said her father would put his penis in her "butt" and touch her vagina. "Family touching" happened a lot until August 22, when she left and was placed in foster care. During each "family touching" session, her father would put his penis in her "butt." B.D. said it started at home when she was six or seven years old.
B.D. stated her parents made movies, and some were made at her grandmother's house. The one with the dog and the one with mother and daughter were made at B.D.'s house. In the mother-daughter movie, she was directed to touch her mom and kiss her vagina, and her mother kissed B.D.'s vagina. In the movie with Duker, the dog, B.D. stated her parents made R.G. put his penis up next to the dog where the dog would lick it, and put his penis up to the dog's "butt."
Five or six movies were made. In one of the movies, her dad had a whip, and he hit her and her brother. She got hit in the head, but it really did not hurt. R.G. had a lot of white lumps, mostly on his back. In one movie, B.D. stated her grandfather put his penis in her "butt," and R.G. put his penis in her grandmother. B.D.'s mom and dad were taking the pictures. B.D. said her grandparents lived in Sterling.
B.D. testified her mother used "this white thing" with a cord for her vagina. It did not make a sound, but when she took it out it had blood on it, and her mother had B.D. clean it. Her mother used "the white thing" a lot of times. Sometimes in the bathroom and sometimes in the bedroom. She would use it in her bedroom when B.D. was watching television in there. B.D. testified her parents showed a movie once which showed how to do sex; they told her and her brother that it would teach them something.
On cross-examination by Vernon's attorney, B.D. stated when she said "family touching" happened "lots of times" she meant about once or twice a month. She stated her parents never showed her the movies they took of her. The movies were made on a camera that had film on a spool that went through a projector. B.D. stated she thought it was an accident that her father hit her with the whip handle; he was trying to hit R.G.
On cross-examination by respondent's counsel, B.D. stated "family touching" and "sex touching" were mostly both the same thing. The movies lasted longer than one-half hour but less than one hour. The first movie made was sex touching with herself, her mother, father, and brother. The one with her grandparents was second to the last. The one with R.G. and the dog was made after the first one when she was about five or six years old.
B.D. stated she knew Tim B. and one time when his sister Brandy *120 was out shopping, B.D. said Tim put his penis in her "butt." They were in a shed by the house. Tim also had R.G. get on him and Tim put his penis in R.G.'s "butt." B.D. stated she did not know how many times this happened with Tim. She did not tell her parents about it because they didn't really care what happened because they did it too. The incident with Tim B. happened after her parents started making the movies. Tim lived behind her grandparents' house. Her father had more than one whip, and he kept them by the deer head. Her mother kept "the white thing" in her dresser. The movie camera was kept at her grandparents' house. Just the dog and mother and daughter movies were made at B.D.'s house; the rest were made at her grandparents' house.
B.D. stated she didn't want to testify in front of her parents because she was too scared. Her grandmother and her parents told her not to tell the truth, but to lie. She was mad at them for telling her to lie. She said when her parents visited her in foster care they said they would have a "Welcome Back Home" party. B.D. said she took that to mean coming back and having sex and everything, and she did not want that. She learned the various words she used in her testimony from her parents.
On cross-examination by the GAL, B.D. defined three of the words she used during her testimony, and stated that all the things that were talked about happened in Rockford. The boys and girls in the sex movies she saw were older than she. In the "family touching" movie, her grandparents were running the camera. She never heard what happened to the movies. B.D. stated her mother often used "the white thing" on her by having B.D. put it in her vagina.
Upon examination by the court, B.D. stated the camera was one where you could show pictures and take them with the same instrument. She saw the one on learning how to do sex with that camera; she recognized the people in the movie from their pictures on the box. Every time her mother used "the white thing" it came out bloody, and B.D. had to clean it. B.D. stated her mother tried to put "the white thing" in B.D.'s vagina, and B.D. put it where she (B.D.) wanted it to go. The cord was in then. It tickled her, but didn't make any noise. B.D. did not have to clean it afterward because there was nothing on it.
Lou Gadow, executive director of Family Advocate, was then called as a witness for the State. Family Advocate operates several programs for qualified rehabilitation of families in which physical and sexual abuse of children is involved. With no objection, Gadow was qualified as an expert in the field of sexually abused children.
*121 Her contact with R.G. and B.D. began in August 1985; she continues to work with B.D., but contact with R.G. has been interrupted by his placement in two different specialized treatment facilities. She averaged three sessions per week with the children during the period August 1985 to June 1986; she no longer sees R.G. that regularly, and, on a decreasing basis since January 1986, she now sees B.D. weekly.
When she interviewed R.G. on August 23, 1985, statements he made caused her to suspect he had been sexually abused, but the circumstances were unclear. R.G. initially described how wonderful his home life was and how his family had no problems, but he then began describing his stepfather in negative terms and alluding to marital fights. He also explained that he was in foster care due to a neighbor's claim that he and his sister were being sexually abused; he denied that, and he indicated reasons why the neighbor would say such a thing, such as his stepfather getting mad and talking too loudly. Further, R.G. spontaneously denied having had sex with his mother and stepfather.
When she interviewed B.D. on August 26, Gadow was questioning her about ways in which B.D.'s mother showed she loved her. During the interview, B.D. did not use the word "masturbate," but she described what her mother did with what B.D. called "the white thing." B.D. described that her mother put it in her own vagina, sometimes while B.D. watched cartoons on TV in the bedroom. B.D. stated she had tried to use "the white thing," too. During another interview, B.D. stated her mother used "the white thing" on days when her mother was bleeding, and it was B.D.'s job to clean the white thing intermittently during those sessions.
During the month of September, B.D. made reference to pictures, both as to film and stills and made reference to her mother's sale of pictures. B.D. said her mother's pictures were of ladies or adult people "doing it" (meaning sexual activity) with various animals, such as a cow, dog and pig.
In an interview on April 9, 1986, B.D. was listing "yucky" things that had happened, and she listed when her father put his penis part of the way into what she called her "butt." That act was one of the ones performed in "family touching." B.D. said "family touching" took place "lots of times since `[she] was little.'" B.D. had difficulty expressing frequency.
In September 1985, B.D. described some activities to Gadow being "like in the movies," and, in October 1985, B.D. disclosed the making of movies by her family. In the September interview, B.D. said she *122 wanted to show Gadow what it was like at home. B.D. designated Gadow in the role of her mother, the respondent. B.D. then devised several props out of paper, one being "the white thing" and one a pretend-penis. B.D. then directed a scenario in which the mother had the daughter touch and lick the mother's genitalia and vice versa. The mother then told the daughter to "[g]et the penis," which the mother was then to thrust in and out of herself. B.D. tried to crawl onto Gadow's lap, but Gadow would not permit actual contact during this scene being acted out. Because Gadow was not pretending to push the penis in and out, B.D. said she would be the mother. B.D. then performed an up-and-down hip motion, accompanied by moaning noises and a simulated orgasm.
Later, after a break in this session, B.D. stated that R.G. was in a movie about a boy having sexual contact with a dog, Duker, which included oral contact between R.G. and the dog and vice versa, and simulated anal intercourse between R.G. and the dog.
Gadow testified B.D.'s behavior and statements were consistent with those of a sexually abused child. Gadow stated B.D. also demonstrated behaviors that were indicative of physical abuse and threats by her family. Gadow stated B.D. had changed significantly for the better since being removed from her parents in terms of increased performance, increased I.Q., verbal skills and expression of herself. Gadow stated B.D. is more self-sufficient and able to go to school without fear of peer problems.
On continued direct examination, Gadow testified that on April 9, 1986, B.D. reaffirmed what she told her about her father's attempted anal intercourse with her, which occurred on more than one occasion. Beginning in October 1985, B.D. told Gadow about "dirty movies" she had been in where they did "family touching" including manipulation of her by her father. Her father had a whip in one movie, and her parents had wanted her to have sexual contact with Duker, but only R.G. did.
On July 18, 1986, Gadow discussed with B.D. her having visits with her relatives and her grandparents. Gadow stated B.D.'s maternal grandmother had requested visitation and wished to be considered as a placement resource. B.D. stated she did not want visits with her grandmother because what R.G. said about her being the boss of the movies was true. B.D. stated her grandmother decided who was going to be in the movies and who was going to do what in the movies. Gadow stated B.D. had not had any unsupervised visits with her grandmother since her placement in foster care.
Gadow stated that R.G. clearly indicated to her that Vernon had *123 hit him with a board and slapped him several times. R.G. was not interested in reuniting with his stepfather, and he had mixed feelings about his mother. R.G. stated he felt he (R.G.) should be put in jail, too, if they were putting his mother there because he did these things also. R.G. told Gadow he felt he was a sex offender, and he told her he had sexually abused B.D. and two of his cousins before being taken into foster care. As to why he did this, R.G. stated, "I wanted to do it to somebody else instead of having it done to me." He was afraid he was "going to be like [his] family."
Gadow testified the children denied any abuse only on the first day she met with them. After that, they gradually spoke about contact with each other and with Tim B. Neither child retracted his or her statement with regard to the sexual abuse by their mother and Vernon, but after his visit with his mother before she left for the Department of Corrections, R.G. stated he wished he had not told about it.
Based on the children's behavior, statements, and their ability to visually, psychologically and physiologically relate various sexual acts, it was Gadow's opinion that they had been sexually abused.
On cross-examination by counsel for Vernon Daniels, Gadow acknowledged that she observed and R.G. demonstrated much rage at home and in school not only toward his parents but toward his foster parents, older adults, and other and younger children. R.G. many times made statements that were untrue which he later retracted.
Gadow stated the children had been medically examined, but she did not believe the exam was to determine whether they had been sexually abused. The report she saw showed neither child had a venereal disease. She stated that prior to disclosure of sexual abuse, the children's stories were inconsistent; after full disclosure in October, they were consistent regarding sexual contact with their mother and Vernon. R.G. first told her the magazines came from a garbage can, but later each child said the other had taken the magazines from the parents' bedroom. In September 1985 R.G. told Gadow he did not care if his stepfather went to jail, but he felt he could not tell the truth because his mother would go to jail. Gadow stated R.G. admitted to having sexually abused B.D. and two of his cousins before he was taken into foster care. R.G. did not abuse his foster parents' two-year-old nephew, however, although he said he did because he was angry with his foster parents.
Gadow was then cross-examined by counsel for respondent. The only reference she heard the police make with regard to using truth serum or a polygraph with R.G. was in connection with the alleged *124 murder of a person by his mother. B.D. called the place where the movies were taken "the studio," and R.G. directed the police to a place where he said the studio was, but then he stated that was not the place where he said it was. R.G. ran away from the foster home once after discussion of his possibly being placed in a residential treatment program. Gadow stated B.D. had begun to adjust, but was still in need of treatments; R.G. continues to be severely disturbed and is in a specialized residence facility; he has done very poorly and is continually anxious. Gadow stated she believed R.G. was capable of lying about someone if he did not like him, but she was not sure he could stay with it once he was interrogated. Because of the doubt about what R.G. was saying with regard to the extreme level of sexual abuse he kept reporting, Gadow questioned him herself, and the truth of what R.G. was alleging was confronted frequently.
Gadow was then cross-examined by the children's GAL. The anger R.G. exhibited was typical of a victim of a male sexual abuser and also because his mother was one of the perpetrators. She knew that the police had found further magazines, a projector, a floodlight, a dildo, a vibrator and a sexually explicit film.
It was Gadow's opinion that the children had disclosed the full truth in October, because prior to that time, in September, R.G. had been upset and he said he was afraid he could not keep B.D. from telling the truth, and that it would be all his fault if the truth came out. In October, R.G. said he was having nightmares and wanted the truth to come out, but he was afraid to tell it. Gadow said they could not help unless they knew what the problem was. R.G. then talked with Mark Morrison, of Family Advocate, and remarked about his fear that his mother would go to jail and about what would happen to him if he told. Later that evening, R.G. told his foster parents he could not keep the secret any longer, and Gadow and Morrison were called. When the children began talking about the movies, Gadow felt the interview was moving away from counselling into investigation, and DCFS and the police were contacted to pick up the investigation.
Gadow believed B.D. had lied at times under the influence of her brother, but had been fairly truthful and honest. R.G. has also been fairly truthful about the sexual assault, but Gadow could not say he has been genuinely honest. The children's stories were consistent with each other after the disclosure on October 10 except that B.D. for a long time denied any sexual contact with the dog. Gadow stated the children both wished to be adopted and did not wish contact with their mother, Vernon, their grandparents, or their aunts and uncles.
On redirect examination, Gadow said the children were shown the *125 movie by their parents to learn ways to have sexual contact; B.D. told the police that she had seen the movie which showed people of different sizes having sexual contact. Gadow said R.G. told her two stories about the murder which he had not actively retracted; R.G. just says he lied and will not say why he lied. Gadow stated she did not know whether to think it was a lie or not.
On re-cross-examination by counsel for Vernon Daniels, Gadow stated the children were together in the various foster homes where they were placed until R.G. was placed in residential treatment, and that they were very, very closely supervised in the foster homes. She observed B.D. lie under the influence of her brother in that when Gadow was with them, R.G. would make a statement and say to B.D., "B.D., tell them that is right," and B.D. would say "That is right."
Although he retracted it on one occasion, R.G. continued to tell the story of the murder until April 1986, and he would add or change details. In the story of the murder, R.G. was the person who committed the shooting.
On re-cross-examination by counsel for respondent, Gadow stated on several occasions R.G. stated it was his mother who did the shooting. The police showed the children the box of the film which was recovered by the police from their home, and the children described what the movie inside the box was about. It was a commercially made movie. As far as she knew, the movies taken of the children were not recovered.
Over the objections of counsel for Vernon Daniels and counsel for the respondent, the State tendered to the court certified copies of the convictions of Vernon Daniels for indecent liberties with a child and aggravated criminal sexual assault, and of Estella Daniels for aggravated criminal sexual assault. In order to establish the relevance of the exhibits to the State's petition, the State called Virginia Steele to testify concerning the trial of Vernon Daniels for aggravated criminal sexual assault. A recess was declared in order to obtain the court file pertaining to that cause.
The State called Lou Gadow with regard to count X of its petition, naming Bobby Powers, and count XII, addressed to "All Whom It May Concern." Gadow testified R.G. and the respondent identified Bobby Powers as R.G.'s natural father. R.G. told Gadow he had had no contact with Powers. The State represented that its efforts to locate Powers were unsuccessful and an order of default was entered against Powers on August 25, 1986.
The court then took judicial notice of Vernon Daniels' conviction after a bench trial of aggravated criminal sexual assault against R.G. *126 based on a three-page statement signed by R.G. which detailed much of the same evidence received by the court in the instant cause. The court also took judicial notice of Vernon Daniels' conviction in 1980 for indecent liberties with a child, T.D., another daughter of his, to which charge he pleaded guilty.
The court then took judicial notice of respondent's conviction for aggravated criminal sexual assault against R.G. based on much of the same evidence heard by the court in the instant cause. At the request of counsel for the respondent, the court also took judicial notice that respondent was appealing that conviction. As noted previously, respondent's conviction for that offense has been affirmed by this court. The State then rested.
Vernon Daniels then testified, denying any sexual contact between himself and the children. He also denied he had any pornographic magazines, had shown the children a sexually explicit movie, hit R.G. with a board, or caused the children to commit any acts of intercourse or masturbation with a dog. He admitted he slapped R.G. when they were "playing around" and stated all he ever used was a small ruler. When his wife and B.D. went to Peoria for a funeral, he and R.G. stayed home.
On cross-examination by counsel for respondent, Daniels acknowledged that the children played with their grandparents' neighbor, Tim B., who was 17 or 18. Daniels stated he took movies once at the grandparents' house; he had the floodlight with him. Daniels stated the police took a one-step camera from his house that was his. On cross-examination by the State, Daniels stated he did not receive any counselling after he pleaded guilty to indecent liberties. He did not feel he needed counselling. On cross-examination by the children's GAL, Daniels stated nothing happened with his daughter, T.D., and he pleaded guilty to indecent liberties because he was threatened that something would happen to him if he didn't. He does not have a VCR (video cassette recorder), but he has an "RSA" which uses records and plays them on the TV screen. He keeps whips on top of a deer head in his bedroom.
Counsel for Vernon Daniels then rested, and respondent's counsel presented no evidence. Following arguments, the court rendered its judgment finding R.G. and B.D. abused minors. Its order irrevocably terminated the parental rights of Estella Daniels, Vernon Daniels, Bobby Powers and All Whom It May Concern, and named the Guardianship Administrator for the DCFS as the children's legal guardian and custodian with the power to consent to the adoption of the minors.
*127 Respondent first contends she was denied the effective assistance of counsel in that counsel inadequately prepared for the hearing and thereby failed to present the "substantial defense" she asserts was available to her as evidenced by reference to her criminal trial.
 1 Although the proceeding at bar was civil in nature, certain due process safeguards have been extended for the protection of juveniles (In re M.D.B. (1984), 121 Ill. App.3d 77, 84), among them the right to counsel as found in the fourteenth amendment to the United States Constitution. (In re Gault (1967), 387 U.S. 1, 18 L.Ed.2d 527, 87 S.Ct. 1428; U.S. Const., amend. XIV.) This right to counsel has been codified and extended to the parents of a minor who are parties respondent in a proceeding under the Juvenile Court Act (Act). (Ill. Rev. Stat. 1985, ch. 37, par. 701-20(1).) Due to the instant respondent's indigency, counsel was appointed for her under that statute.
 2 Contrary to the State's unsupported suggestion that counsel so appointed in a termination of parental rights proceeding should possibly be judged by a different standard of effectiveness than counsel representing a defendant in a criminal matter, it has been stated that implicit within the right to counsel is that such representation be effective. (In re M.D.B., 121 Ill. App. at 84; In re Johnson (1981), 102 Ill. App.3d 1005, 1011, citing Powell v. Alabama (1932), 287 U.S. 45, 77 L.Ed. 158, 53 S.Ct. 55.) Although the specific issue in Johnson was whether counsel had labored under a conflict of interest, the cause nevertheless involved the termination of the appellant's parental rights, and we reject the illusory distinction drawn by the State. It would seem a useless gesture on the one hand to recognize the importance of counsel in proceedings to terminate parental rights  as evidenced by our statutory right for same  and, on the other hand, not require that counsel perform effectively. Moreover, as respondent points out in reply, other jurisdictions have applied to termination of parental rights proceedings the same standard of effectiveness of counsel as that applied in criminal cases. E.g., In re Trowbridge (1986), 155 Mich. App. 785, 401 N.W.2d 65; State v. Anonymous (1979), 179 Conn. 155, 425 A.2d 939; In re Voeltz (Iowa 1978), 271 N.W.2d 719.
 3-5 Accordingly, our determination of whether respondent shall prevail on her claim that she was deprived of her right to the effective assistance of counsel is guided by the standards set out in Strickland v. Washington (1984), 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052, and adopted by our supreme court in People v. Albanese (1984), 104 Ill.2d 504. That is, respondent must show that her counsel's representation fell below an objective standard of reasonableness and *128 that there is a reasonable probability that the result would have been different had there not been ineffective assistance of counsel. (Strickland, 466 U.S. at 687-95, 80 L.Ed.2d at 693-98, 104 S.Ct. at 2064-69.) In determining whether there is such a reasonable probability, we must consider the totality of the evidence before the judge. (People v. Wilson (1986), 149 Ill. App.3d 1075, 1077-78.) Errors in trial strategy or judgment alone do not establish that the representation was incompetent. People v. Bell (1987), 152 Ill. App.3d 1007.
Respondent contends counsel's failure to adequately prepare prior to the hearing prejudiced her in that no defense or denial was made on her behalf even though "substantial defenses were available."
Counsel's fee petition in the record reflects that in October he spent one hour reviewing the file, one hour preparing a writ of habeas corpus ad testificandum and conferring with the assistant State's Attorney. On November 3, the first day of the hearing, he had a one-hour conference with respondent. On November 24, the date of the continued hearing, he had a two-hour conference with her. The remaining 10 1/2 hours expended was time spent in the hearing itself. It does not appear counsel reviewed the report of proceedings of the respondent's criminal trial, which was transcribed 3 1/2 months previously, or that he consulted with counsel for respondent at that trial.
Respondent finds this amount of preparation to be analogous to his having been appointed on the day of the hearing, as was the case in Powell v. Alabama (1932), 287 U.S. 45, 77 L.Ed. 158, 53 S.Ct. 55), and claims the failure of counsel to investigate and prepare falls below accepted norms of performance. She cites in support People v. Bell (1987), 152 Ill. App.3d 1007, and People v. Howard (1979), 74 Ill. App.3d 138.
In Bell, counsel's failure to interview potential witnesses whose testimony may have supported the defendant's theory of self-defense was found, inter alia, to have caused a prejudicial denial of adequate representation. Similarly, in Howard, counsel's failure to discover a discharge summary from a mental hospital which supported the defendant's pretrial defense of incompetency and her trial defense of insanity was found to be ineffective assistance of counsel, in that it resulted in his inability to use it effectively at both of the defendant's competency hearings and at her trial.
We find distinguishable, however, respondent's claim of ineffectiveness here which is based on counsel's failure to call Dr. Charles DeHaan as a witness. Dr. DeHaan was the emergency room physician who examined the children in August 1985 after they were removed from their home and placed in foster care. Dr. DeHaan testified at respondent's *129 criminal trial that he found no evidence of genital or rectal trauma to either child and testified that B.D.'s hymen was intact. Dr. DeHaan testified that if an object larger than the hymenal ring had passed through it, the ring would tear and heal irregularly, leaving scar tissue, and that he did not observe any scar tissue. He also testified that an adult erect male penis should damage the hymenal ring, but he did not measure B.D.'s hymenal opening, and he stated that an object that was too small or too soft would not have torn the hymen.
Respondent asserts that this evidence was a substantial defense to the State's petition in light of the instances of sexual intercourse testified to at the hearing by R.G. and B.D., and that it was prejudicial ineffective assistance of counsel for counsel not to have presented it.
 6 We do not view this evidence as the type of "substantial defense" evident in Bell and Howard, however. Those were legal defenses, defenses "complete and adequate in point of law." (Black's Law Dictionary 378 (5th ed. 1979).) Dr. DeHaan's testimony reveals no such complete and adequate defense. At most, it discredits the minor's understanding of what vaginal intercourse is and whether it occurred. It does not wholly negate the possibility of sexual intercourse, however, considering the unknown sexual maturity and physical characteristics of the males involved, notwithstanding that there was evidence of their approximate ages. Further, Dr. DeHaan did not testify whether, based on the minors' testimony concerning rectal intercourse, any evidence of trauma would have been expected to be found. Moreover, inasmuch as the State's petition alleged, inter alia, that the minors were sexually abused in that respondent caused them to be engaged in various deviate sexual acts, including cunnilingus and sexual contact with a dog, contrary to sections 12-13 and 12-15 of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, pars. 12-13, 12-15), and as defined in section 12-12 (Ill. Rev. Stat. 1985, ch. 38, pars. 12-12(e), (f)), it is unlikely that any diminishment in the minors' credibility created by Dr. DeHaan's testimony would have affected the outcome of the proceeding.
Respondent next contends counsel was ineffective for failing to investigate and utilize certain testimony given by B.D. at respondent's criminal trial which was in contradiction to her testimony at the hearing, including several admissions made by B.D. at the criminal trial that she had lied about a number of things. She also contends counsel failed to investigate and utilize the possible motive R.G. had for lying about his mother (i.e., his recent discovery that Vernon was his stepfather and his anger at his mother because she would not divorce Vernon), and his admissions at trial that he had told numerous lies. *130 She contends that failure to utilize available prior inconsistent statements and admissions to impeach testimony against an attorney's client can serve as a basis for determining ineffective assistance of counsel, citing in support People v. Bell (1987), 152 Ill. App.3d 1007, People v. Howard (1979), 74 Ill. App.3d 138, and People v. Wilson (1986), 149 Ill. App.3d 1075.
As is evident from our discussion of the Bell and Howard cases above, neither one involved prior inconsistent statements but, rather, a failure to discover and utilize substantive evidence that would have materially advanced the defendant's legal defense. Further, although Wilson does involve a prior inconsistent statement, counsel's failure was in neglecting to apply a recently enacted section of the Code which makes prior inconsistent statements by a witness admissible as substantive evidence in a criminal trial. (Ill. Rev. Stat. 1985, ch. 38, par. 115-10.1.) Without the use of the statement as substantive evidence, the court in Wilson denied an instruction on a lesser offense, and the jury was instructed that prior inconsistent statements could be used only for the purpose of deciding the weight to be given the testimony.
 7 The proceeding at bar, however, was civil in nature and section 115-10.1 of the Code is inapplicable. Accordingly, evidence of B.D.'s prior inconsistent statements, R.G.'s admitted lies, and possible motive to lie about his mother would only have affected the weight afforded their testimony by the court. Given other evidence heard by the court, which indicated reasons suggesting why both children initially lied about having had any sexual contact with their parents (fear of what would happen to them and to themselves) and also why they would continue to lie about some things (R.G.'s guilt feelings, B.D.'s list of "yucky" things she did not want to acknowledge), we find no reasonable probability that counsel's failure to discover and utilize this evidence would have affected the outcome of the proceeding.
Respondent also contends she did not receive the effective assistance of counsel due to his failure to object to the "patently inadequate foundation" for Gadow's qualification as an expert witness and to call respondent as a witness so that she could deny the charges.
 8 As the State points out, Gadow's testimony concerning the statements of the children was not admitted as expert testimony, and counsel may have had personal knowledge of Gadow's qualifications which, as a matter of trial tactics, he did not wish to have emphasized to the court. Moreover, counsel's decision whether to object to Gadow's qualifications, and his decision whether to call the respondent as a witness, are clearly matters of trial tactics which are not subject *131 to appellate review and which will not support claims of ineffective assistance of counsel. People v. Madej (1985), 106 Ill.2d 201; People v. Clark (1987), 160 Ill. App.3d 877; People v. Chitwood (1986), 148 Ill. App.3d 730.
Accordingly, we find defendant was not denied her right to the effective assistance of counsel.
Respondent next contends it was error for the court, over her objection, to conduct a single hearing to adjudicate R.G. and B.D. wards of the court and to terminate her parental rights. She argues she was prejudiced by the procedure due to the varying standards of evidentiary proof.
 9 The standard of proof and rules of evidence required in an adjudication of wardship are the same as in civil proceedings, a preponderance of the evidence. (Ill. Rev. Stat. 1985, ch. 37, par. 704-6(1).) In a dispositional hearing, the court may consider "all evidence helpful" in determining the proper disposition, including oral and written reports, "even though not competent for the purposes of the adjudicatory hearing" (Ill. Rev. Stat. 1985, ch. 37, par. 705-1(1)), whereas any termination of parental rights must be based upon "clear and convincing evidence" that a parent is an unfit person as defined in section 1 of "An Act in relation to the adoption of persons * * *" (Adoption Act) (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)). (Ill. Rev. Stat. 1985, ch. 37, par. 705-9(2).) Therefore, respondent argues, "the court would consider in the dispositional aspect, for purposes of termination of parental rights, which requires a stricter burden of proof, evidence which is `not competent' for the adjudicatory hearing which has the lesser standard of proof." Specifically, respondent complains of the testimony of Lou Gadow concerning B.D.'s favorable adjustment after being removed from her home and the feelings of the children about their parents and grandparents. Accordingly, she asserts, where the Act contemplates the holding of separate adjudicatory and dispositional hearings (In re Dalton (1981), 98 Ill. App.3d 902, and In re L.H. (1981), 102 Ill. App.3d 169), and where prejudice from a combined hearing results, such hearing cannot be considered proper. In re Prough (1978), 61 Ill. App.3d 227.
According to the record, the basis for respondent's objection to the procedure at bar was that the different standards would be an "undue onus" on her, and that the State's petition was an attempt to thwart the spirit of the Act in that the State would not be carrying out its statutory obligation to provide remedial services for the purposes of reunification of the family. That is, a minor adjudged a ward of the court may be placed as provided in section 5-7 of the Act if *132 the court finds that the minor's parents are unfit, that it is in the minor's best interest, and that "appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions which have led to such a finding of unfitness." (Ill. Rev. Stat. 1985, ch. 37, par. 705-7(1).) The court determined that so long as the State wished to take on the burden of proving sufficient of their counts I through IX alleging the children to be abused minors by clear and convincing evidence  the burden in a termination proceeding  rather than by a preponderance of the evidence, as is the usual standard, it would allow the State to proceed on the petition as amended to include the allegations of unfitness set forth in counts X, XI and XII. The court also found by its reading of the cases submitted by the parties prior to argument, which were not included in the record here, that there is no absolute right to remedial services.
 10, 11 It is axiomatic that an objection must specify grounds for same and that no grounds other than those stated will be considered on appeal. Respondent's assertion here of prejudice presents a new ground for the objection which was not considered below and need not be considered here. On the merits, however, the evidence respondent complains of being admitted here ostensibly for disposition purposes was, in fact, specifically admissible in the context of the adjudicatory hearing. Section 4-6 of the Act provides for the admission in evidence of:
"Proof of the impairment of emotional health or impairment of mental or emotional condition as a result of the failure of the respondent to exercise a minimum degree of care toward a minor may include competent opinion or expert testimony, and may include proof that such impairment lessened during a period when the minor was in the care, custody or supervision of a person or agency other than the respondent." Ill. Rev. Stat. 1985, ch. 37, par. 704-6(4)(f).
Although we subscribe to the "better practice" of a bifurcated hearing as noted in In re Dalton and In re Prough (Dalton, 98 Ill. App.3d at 906; Prough, 61 Ill. App.3d at 231), we conclude respondent was not prejudiced by the combined hearing conducted here.
 12 We find no merit in respondent's next contention that the court erred in not allowing her to be present during the testimony of R.G. and B.D. because it violated her right to be present as provided in section 1-20 of the Act (Ill. Rev. Stat. 1985, ch. 37, par. 701-20(1)). She argues that had she been present during the children's testimony, she could have assisted counsel in providing some defense to the allegations presented, particularly where she has contended that *133 counsel was ill-prepared for the hearing. She distinguishes In re Brooks (1978), 63 Ill. App.3d 328, on the basis it did not involve a termination of parental rights, which, she argues, "is as drastic and permanent an action as can be taken" (Blakey v. Blakey (1979), 72 Ill. App.3d 946) and requires strict compliance with the applicable statutes. In re Moriarity (1973), 14 Ill. App.3d 553.
Respondent's right to be present at the hearing was only one of the procedural safeguards guaranteed by the Act; she also had the right "to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel." (Ill. Rev. Stat. 1985, ch. 37, par. 701-20(1).) We have determined above that respondent received the effective assistance of counsel at the hearing, and it is clear he reviewed the court file and discussed the matter both with the assistant State's Attorney and with respondent. Although he did not present evidence, he was under no obligation to manufacture a defense for respondent (In re M.D.B. (1984), 121 Ill. App.3d 77, 80), and he cross-examined both children at the hearing.
"Due process is not a technical concept unrelated to time, place, and circumstances; rather, it is flexible and calls for such procedural protections as a particular situation demands. [Citation.] Procedural aspects of due process require that a person be given notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the case. [Citation.]" In re E.L. (1987), 152 Ill. App.3d 25, 33.
This flexible nature of due process is recognized in the Act wherein it provides that the court "may allow the minor to testify in chambers with only the court, the court reporter and attorneys for the parties present." (Ill. Rev. Stat. 1985, ch. 37, par. 704-6(4)(d).) Thus, the court here had discretion to exclude the respondent during the children's testimony. We find no abuse of that discretion where the court interviewed R.G. and B.D. prior to their testimony and determined that such exclusion would be in the minors' best interest.
Respondent's final contention is that the court's finding of unfitness was not supported by clear and convincing evidence. She argues the children's testimony was uncorroborated, save for the opinion testimony of Lou Gadow, which she asserts was based upon Gadow's selective belief and disbelief of the children. She also discredits R.G.'s testimony due to his preoccupation with things of a sexual nature and his far-reaching lies.
 13, 14 It is well established that a finding of unfitness must be *134 supported by clear and convincing evidence and that the finding will not be reversed on appeal unless it is against the manifest weight of the evidence. (In re Brown (1981), 86 Ill.2d 147; In re Harpman (1986), 146 Ill. App.3d 504.) "Clear and convincing evidence is stated to be something less than proof beyond a reasonable doubt. (In re Stephenson (1977), 67 Ill.2d 544, 367 N.E.2d 1273.)" (In re Johnston (1983), 118 Ill. App.3d 214, 218.) The findings of the trial court must be given great deference since it has the opportunity to view and evaluate the testimony of the parties and witnesses. In re R.M.B. (1986), 146 Ill. App.3d 523, 527-28.
The court here found the respondent was unfit as to each of the minors in that she had substantially neglected them, been extremely and repeatedly cruel to them, was a depraved individual, and had failed to protect them from conditions within the environment which were injurious to their welfare. Section 1 of the Adoption Act lists the grounds whereby a person may be found to be unfit. (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D).) "Depravity" is one such ground and has been defined as "an inherent deficiency of moral sense and rectitude." (See In re Abdullah (1981), 85 Ill.2d 300, 305.) A person may be found to be unfit on one or more of the grounds listed.
Based on our review of the record, we find respondent's unfitness was proved by "clear and convincing" evidence and that no reversal is warranted. People v. Morgan (1977), 69 Ill.2d 200, 206, relied on by respondent, was a prosecution for indecent liberties which, of course, required proof beyond a reasonable doubt. The complainant's account there was not corroborated; she told a teacher a different version of an attempted sexual assault during the same month by another individual, and she had a history of fabricating stories. Based on that record, the supreme court affirmed reversal of the defendant's conviction based on insufficiency of the evidence.
 15 Here, although R.G. admitted he had lied in the past and B.D. was subject to his influence at times, their credibility was a matter for the court to determine, and, based on the record, we see no basis not to defer to its evaluation. Each of the minors testified separately and in detail concerning the litany of sexual "family touching" practices which occurred at the instigation of the respondent and her husband. There was expert testimony that the children had been sexually abused and that they were still either undergoing treatment or had been placed in a treatment facility as a result of the sexual abuse. Although the certified copy of respondent's conviction for aggravated criminal sexual assault against R.G., by itself, would not support a finding of unfitness based on depravity (In re Abdullah, 85 Ill.2d at *135 306), nevertheless, it must be viewed as corroborative of R.G.'s testimony since he also testified in that cause as to "family touching." Moreover, proof of respondent's abuse of R.G. was also specifically admissible as to her abuse of B.D. Ill. Rev. Stat. 1985, ch. 37, par. 704-6(3).
In sum, we conclude the court's finding of respondent's unfitness was not against the weight of the evidence. Accordingly, the judgment of the circuit court of Winnebago County is affirmed.
Judgment affirmed.
LINDBERG, P.J., and INGLIS, J., concur.