# Illinois Official Reports

## Appellate Court

---

### *In re Mi. S.*, 2016 IL App (3d) 160265

---

| | |
|---|---|
| Appellate Court Caption | *In re* Mi. S., P.S. and Ma. S., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Bahaa S., Respondent-Appellant). |
| District & No. | Third District<br>Docket Nos. 3-16-0265, 3-16-0266, 3-16-0267 cons. |
| Filed | October 13, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Will County, Nos. 12-JA-0157, 12-JA-0158, 12-JA-0159; the Hon. Paula Gormora, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel J. Kallan, of Daniel J. Kallan Ltd., of Joliet, for appellant.<br><br>James Glasgow, State's Attorney, of Joliet (Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Stephanie Speakman, of Frankfort, guardian *ad litem*. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Lytton and Schmidt concurred in the judgment and opinion. |

**OPINION**

¶ 1    The respondent father, Bahaa S., appeals from an order of the trial court, finding him to be an unfit parent and terminating his parental rights as to his minor children, Mi. S., P.S. and Ma. S. On appeal, the father argues that the trial court erred in finding him unfit on the basis of "extreme cruelty" under section 1(D)(e) of the Adoption Act (750 ILCS 50/1(D)(e) (West 2012)) where he did not commit an act of physical cruelty to the minors. We affirm the trial court's finding of unfitness.

¶ 2                                         FACTS

¶ 3    The respondent father was criminally charged with the December 19, 2012, murder of his wife, who was the mother of their four minor children. The youngest three minors are the subject of this appeal from the trial court's order terminating the father's parental rights.

¶ 4    On December 19, 2012, the father was taken into police custody and the minors were taken into protective custody by the State. The State filed a juvenile petition requesting that the minors be made wards of the court, alleging the minors were neglected in that their environment was injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2012)) and were dependent in that they were without a parent, guardian or legal custodian (705 ILCS 405/2-4(1)(a) (West 2012)).

¶ 5    On December 27, 2012, following a temporary shelter care hearing, the trial court found there was probable cause to believe the minors were neglected in that "domestic violence between the mother and father led to mother's death [and] the four year old [minor] was home at the time." The trial court found there was probable cause to believe the minors were dependent in that the minors, who were under the age of 18, were without parents due to their father being charged with the murder of their mother. The trial court found that there was an immediate and urgent necessity for protection of the minors and for them to be placed in shelter care. The trial court ordered that the minors be placed in the temporary custody of the Department of Child and Family Services (DCFS). DCFS was granted the authority to place the minors. Visitation between the father and the minors was ordered to be at the discretion of DCFS.

¶ 6    On February 4, 2013, the oldest minor, 14-year-old K.S. (who is not one of the three minors that are the subject of this appeal) requested visitation with the father, who was incarcerated. On February 11, 2013, the trial court granted K.S.'s motion for visitation as to K.S. only. K.S. also indicated to the trial court that he wished to show the father a certificate that he earned from school and wished to write the father letters. K.S. asked the trial court to transfer his placement and his siblings' placement from his aunt and uncle's home to the home of family friends. The trial court was informed that the family friends had moved to Indiana but agreed to foster parent the minors. The family's church agreed to purchase a home for the potential foster family to relocate to Illinois so that they could foster parent the minors. The trial court asked K.S. to be patient with the judicial system and his current placement while the family friends were being relocated to Illinois.

¶ 7    According to reports by Lutheran Child and Family Services (LCFS), Court Appointed Special Advocate (CASA) and the minors' counselors, all four of the minors were placed in the home of family friends on July 6, 2013. On July 11, 2013, an incident occurred involving K.S.

and the 14-year-old daughter of the family friends that included police involvement, and K.S. was hospitalized and began receiving psychiatric services. After his discharge from the hospital on July 30, 2013, K.S. was placed in a traditional foster home and received treatment for post-traumatic stress syndrome and depression.

¶ 8     The three youngest minors—Mi. S., P.S., and Ma. S.—remained in the home of family friends. The therapists of the youngest three minors recommended that no visitation should be approved between them and their father or between them and their older brother, K.S.

¶ 9     On August 26, 2013, an adjudication hearing took place after a few continuances so that an Arabic interpreter could be arranged for the father. At the adjudication hearing, the parties stipulated that the minors' mother was deceased and their father was incarcerated. The trial court found that the minors were dependant and ordered that DCFS remain temporary guardian and custodian of the minors pending the final disposition of the case.

¶ 10    On November 22, 2013, a dispositional hearing took place, at which the State requested the minors be made wards of the court. The State presented two exhibits: the dispositional report and the service plan. Defendant's attorney agreed that the minors should be made wards of the court and requested that the father be found dispositionally unable to care for the minors due to his incarceration rather than dispositionally unfit. Defense counsel argued that no evidence of the father's unfitness had been presented other than the incarceration itself. The trial court found the father to be dispositionally unfit and found that it was in the best interest of the minors for them to be made wards of the court. The trial court placed the minors in the custody and guardianship of DCFS. The factual basis for the dispositional unfitness finding was that the father was incarcerated pending criminal charges of the murder of the minors' mother and the dispositional report and service plan indicated a history of domestic violence in the home between the father and the minors' mother, with the minors witnessing several incidents and with reports of the father hitting, choking, and biting the minors' mother. The father objected, indicating that the reports of domestic violence were not true, and the trial court noted his objection.

¶ 11    On January 22, 2015, the State filed a petition to terminate the father's parental rights as to all four of the minors, and later amended the petition by striking K.S. from the amended motion. In the petition, the State alleged that the minors' mother was deceased and the father was an unfit parent in that (a) he failed to maintain a reasonable degree of interest, concern or responsibility to the minors' welfare (750 ILCS 50/1(D)(b) (West 2012)) and (b) exposed the minors to extreme or repeated cruelty (750 ILCS 50/1(D)(e) (West 2012)).

¶ 12    On April 14, 2016, the hearing on the petition to terminate parental rights took place as to Mi. S., P.S., and Ma. S. The State introduced the death certificate of the minors' mother into evidence. The cause of death listed on the death certificate was "craniocerebral injuries" due to blunt head trauma and assault.

¶ 13    Detective Heather Trinidad testified that on December 19, 2012, she was called to the family's residence in regard to a deceased body on the front lawn. When Trinidad arrived at the family's residence she observed a female body on the front lawn. Trinidad went inside the home and saw four-year-old Mi. S. on the couch with what appeared to be blood spatter on his face and clothing. Trinidad took Mi. S. into protective custody. Three other minor children resided in the home, but they were not home at the time of the incident. The following day Trinidad was present for a victim sensitive interview of Mi. S., which was recorded. The State entered the video of Mi. S.'s interview into evidence, in addition to photographs of Mi. S. with

blood spatter on his face, a female body laying in the grass, a metal bar in the grass that appeared to have hair and blood on it, the driver's license of the minors' mother that appeared to have blood on it, and the father with blood on his clothing. Trinidad confirmed that the video showed Mi. S. stating that his dad hit his mother with a hard object. Mi. S. made motions with his hands to demonstrate how many times his dad hit his mother and that his dad hit his mother in the stomach. Trinidad testified that the metal bar shown in one of the photographs was similar to the object Mi. S. described as the object his father used to strike his mother. Mi. S. was the only eyewitness to the incident.

¶ 14    Detective Sam Dajani testified that the father was read his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and then spoke with police. The father indicated that he and the minors' mother got into an altercation on the morning of December 19, 2012, because she wanted to go visit their daughter in the hospital and the father did not want her to leave. The minors' mother made a comment about the father being unemployed and a physical altercation ensued. The minors' mother bit the father and exited the home. The father pursued her out of the home with four-year-old Mi. S. following behind them. When the father caught up with the minors' mother he struck her with a curling bar that had been located near the front door inside the residence. The father indicated that he struck the minors' mother once or maybe twice. The father asked police if the minors' mother was okay and what would happen to his children. In cross-examining Dajani, defense counsel asked Dajani if, in his professional capacity as police officer and somebody who was trained in domestic violence and family matters, he would consider the father "a caring father, somebody that you would trust to have control of his children?" Dajani replied, "No."

¶ 15    Denise Beran testified that she was the guardian *ad litem* for the minors. Beran testified that Ma. S. told her that there was a lot of arguing and physical fighting between her parents daily, to the point of slapping, biting, and constant yelling. Ma. S. indicated that no matter what her mother did her father could not be pleased. One main cause of her parents' arguments was financial and the fact that her mother worked all the time because her dad did not work. If her mother did not work, her father would get mad because they would be at risk of losing their home. When her mother was working two jobs her father would get mad because her mother was never home and could not take care of him, the household, and the children. They also argued because the minors' maternal grandmother lived in the home and would side with the minors' mother and the father would be "somewhat argumentative." Ma. S. indicated that she lived in constant fear in the home.

¶ 16    Beran testified that in July 2013 K.S. had been hospitalized for psychological issues. During his psychological consultation in July 2013, K.S. described specific incidents that he had witnessed while living with his parents that had traumatized him. Beran was asked "[a]nd he obviously was clearly traumatized?" Beran replied, "Yes." K.S. indicated that there were daily arguments between his parents and his father was depressed but would not take his medication. K.S. witnessed his parents biting each other. K.S. also witnessed punching, slapping, and constant yelling between his parents. K.S. disclosed that on one occasion he walked into his bedroom and saw his father sexually assaulting his mother on his bed, against his mother's will, while his mother was saying "no" during the sexual assault.

¶ 17    At the close of the State's evidence, the father's attorney motioned the court for a directed finding. After having considered the testimony of Dajani, Trinidad, the victim impact statement of Mi. S., and the photographs of Bahaa, Mi. S. and the blood and hair covered metal

curling bar, the trial court found there was clear and convincing evidence by the State to prove paragraph "b" of the termination petition regarding extreme or repeated cruelty but not as to paragraph "a" regarding the father's alleged failure to maintain a reasonable degree of interest, concern, or responsibility toward the minors.

¶ 18    The trial court noted the death certificate of the minors' mother indicated that she was struck with a blunt object and her cause of death was cranial cerebral injuries due to blunt head trauma; the victim impact statement of Mi. S. revealed that he witnessed the father hit his mother with a long thing and he hit her in the stomach and the head; Mi. S. indicated that his father killed his mother; Mi. S.'s statements were corroborated by a photograph of Mi. S. with blood spatter on Mi. S.'s face and clothes, the testimony of Trinidad who arrived at the residence to find Mi. S. sitting on the couch with blood spatter on his face and clothes, and the testimony of Dajani, who took the father's statement that he and his wife were involved in an altercation, during which the father followed her out of the house with a curling bar and struck her once, if not twice, with Mi.S. in their vicinity. The trial court further noted the photograph of the father in custody with blood on his shirt. The trial court found the State presented clear and convincing evidence of extreme cruelty to Mi. S. "as he was an eyewitness to the killing of his mother." As to P.S. and Ma. S., the trial court found "that the killing of their mother at the hands of their father is extremely emotionally cruel." For those reasons, the trial court denied the father's motion for directed finding as to paragraph "b" of the termination petition.

¶ 19    The father did not present any evidence. The trial court found, by clear and convincing evidence, that the father was unfit based upon the allegations by the State with respect to extreme or repeated cruelty. The trial court indicated that its decision that the State had met its burden of proof was based upon essentially the same evidence that supported its decision with respect to the motion for directed finding—testimony of Dajani, testimony of Trinidad, the victim sensitive interview of Mi. S., the death certificate of the minors' mother, and the photographs of Bahaa, Mi. S., and the blood and hair covered metal curling bar. The trial court indicated that the State had presented clear and convincing evidence of extreme cruelty as to Mi. S. "since he was an eyewitness to the killing of his mother." With respect to P.S. and Ma. S., the trial court found that the killing of their mother at the hands of the father was extremely emotionally cruel "since the Court [could not] think of any greater cruelty to any child to have their mother taken out of their life at the hands of their father." The trial court noted that even though P.S. and Ma. S. did not witness the killing of their mother, they have to live with the knowledge that their father left them motherless, which the trial court found to be "extremely emotionally cruel."

¶ 20    After the trial court found the father to be unfit on the basis of extreme cruelty, the case proceeded to a best interest hearing. The trial court found that it was in the best interest of Mi. S., P.S., and Ma. S. to terminate the parental rights of the father and grant DCFS the authority to consent to the adoption of the minors. The father appealed.

¶ 21                                    ANALYSIS

¶ 22    On appeal, the father argues that the trial court erred by terminating his parental rights on the basis of extreme cruelty pursuant to section 1(D)(e) of the Adoption Act. 750 ILCS 50/1(D)(e) (West 2012) (providing "[e]xtreme or repeated cruelty to the child" as a basis for a finding of unfitness). The father argues that the word "cruelty" used in section 1(D)(e) of the

Adoption Act requires physical harm to the child and the trial court erred in interpreting the term "cruelty" to include emotional cruelty. 750 ILCS 50/1(D)(e) (West 2012).

¶ 23   The parties agree that this case involves the trial court's interpretation of subsection (e) of section 1(D) of the Adoption Act. The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Donoho*, 204 Ill. 2d 159, 171 (2003). The best evidence of legislative intent is the plain language of the statute. *Id.* When possible, the court should interpret the statute according to its plain and ordinary meaning. *Id.* If the statutory language is clear and unambiguous a court may not turn to external aids for construction of the statute, but the court may look to similar statutes to aid in construction where the statute is unclear or susceptible to more than one meaning. *In re A.G.*, 325 Ill. App. 3d 429, 433-34 (2001). In addition to the language of the statute, the court should consider the reason for the law, the evil to be remedied, and the purpose to be obtained thereby. *Id.* at 434. The interpretation of a statute is review *de novo*. See *id.*

¶ 24   The grounds for parental unfitness are contained in the Adoption Act. 750 ILCS 50/1(D) (West 2012). The Juvenile Court Act of 1987 also contains several provisions related to the termination of parental rights. See 705 ILCS 405/1-1 *et seq.* (West 2012).

¶ 25   Under the Adoption Act, an "unfit person" means any person whom the court finds unfit to have a child, with the statute enumerating various grounds of unfitness that includes "[e]xtreme or repeated cruelty to the child" under subsection (e) of section 1(D). 750 ILCS 50/1(D) (West 2012). We acknowledge that "extreme or repeated cruelty" has generally been applied to torturous or other extreme forms of physical abuse. See, *e.g.*, *In re B.R.*, 282 Ill. App. 3d 665 (1996) (affirming a finding of unfitness of a father under subparagraph (e) of section 1(D) of the Adoption Act where the father shook his companion's child so violently that the child sustained retinal hemorrhages, brain damage, and cardiac arrest); *In re D.L.W.*, 226 Ill. App. 3d 805 (1992) (affirming a finding that father engaged in acts of extreme and repeated cruelty toward his son where he, on various occasions, had struck his son in the face and left a bruise on his nose, kneed his son in the groin for soiling his underwear, spanked his son with a board for wetting the bed, hit his son with a wooden spoon, and hit his son causing blurred vision); *In re E.P.*, 167 Ill. App. 3d 534 (1988) (affirming a finding of parental unfitness on grounds of extreme and repeated cruelty to the minors where the children's father sexually abused them on several occasions); *In re Wheeler*, 86 Ill. App. 3d 564 (1980) (affirming a finding of the parents' unfitness on the basis of extreme and repeated cruelty by virtue of repeated acts of physical abuse); *In re Dixon*, 81 Ill. App. 3d 493 (1980) (affirming a finding that father's repeated acts of physical abuse against the son constituted extreme and repeated cruelty sufficient to sustain the termination of the father's parental rights).

¶ 26   The case at hand, wherein the trial court terminated the father's parental rights on the basis of "extreme cruelty" that involved no direct physical act to the children, appears to be a matter of first impression in Illinois. In reviewing the plain language of the statute, we note that the statute does not limit "extreme cruelty" to physical cruelty. If the legislature intended for the statute to include only physical cruelty, the legislature would have so specified.

¶ 27   The Adoption Act is to be liberally construed in conjunction with the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2012)) and "the best interests and welfare of the child are of paramount consideration." *In re B.W.*, 309 Ill. App. 3d 493, 498 (1999). Interpreting the phrase "extreme cruelty" to exclude extreme emotional cruelty would not be in keeping with consideration of the best interest and welfare of the children. Thus, we hold that the phrase

"extreme or repeated cruelty" under section 1(D)(e) of the Adoption Act encompasses acts of extreme or repeated mental or emotional cruelty to a child.

¶ 28 In this case, the State proved by clear and convincing evidence that the father violently killed the minors' mother as the result of an argument, and there is no indication of a legal justification for the killing. See *In re Hollis*, 135 Ill. App. 3d 585, 587 (1985) (a parent's unfitness must be proven by clear and convincing evidence and will not be reversed unless it is against the manifest weight of the evidence). The evidence also showed that four-year-old Mi.S. witnessed his father violently kill his mother and had blood spatter on his face and clothes as a result of being in the vicinity of his mother's murder. The violent killing of the minors' mother by their father subjected all three minors to extreme cruelty. All three children suffer the consequences of living with the knowledge that their father committed uxoricide—the murder of his spouse, their mother—thereby exposing all three children to extreme emotional and mental cruelty. As the trial court noted, not many intentional acts could be considered more cruel. These three children are not only bereaved by the death of their mother at the hands of their father, but have also been uprooted, lost their home, former relationships, and both their parents. In addition, Mi. S. witnessed the killing, which exposed him to additional extreme emotional and mental cruelty. Thus, the trial court did not err in finding the father was an unfit parent on the basis of "extreme cruelty" to the minors where the facts showed the father killed the minors' mother in a violent act of rage.

¶ 29                                              CONCLUSION
¶ 30 The judgment of the circuit court of Will County is affirmed.

¶ 31 Affirmed.