2021 IL App (2d) 200635
No. 2-20-0635
Order filed March 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* E.Y., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 17-JA-44 |
| | ) | |
| | ) | Honorable |
| (People of the State of Illinois, Petitioner- | ) | Christopher M. Harmon, |
| Appellee v. Ryan Y., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's determination that respondent was unfit was not against the manifest weight of the evidence.

¶ 2    Respondent, Ryan Y., appeals the judgment of the circuit court of McHenry County terminating his parental rights in the minor child, E.Y.  On appeal, respondent challenges the trial court's findings of unfitness and does not dispute the trial court's judgment regarding the child's best interests.  Specifically, respondent argues that the State failed to meet its burden of demonstrating (1) that he had exposed the minor to extreme or repeated cruelty (750 ILCS 50/1(D)(e) (West 2018)), and (2) that he had failed to make reasonable progress toward the minor's

return in two specified nine-month periods (*id.* § 1(D)(m)(ii)). We find the extreme-cruelty ground to be dispositive and we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Because respondent challenges only the trial court's unfitness finding, we confine our factual recitation to the evidence in the record and adduced at the unfitness hearing that is relevant to our decision. Respondent is the biological father of E.Y. At relevant times, the minor child, the minor child's older brother, El. Y., respondent, respondent's wife, Allania Y., respondent's 15-year-old sister-in-law, Anniyah R., and respondent's mother-in-law, all lived together in the Crystal Lake, Illinois, residence. El. Y. is not respondent's biological child, and respondent does not appear to have adopted El. Y.

¶ 5     During the evening of August 3, 2017, respondent and his wife were arguing about her "inappropriate behavior" with a coworker. The argument was taken inside of the home. According to statements given by respondent to the police, during the argument, they were in the kitchen, Allania Y. poured out respondent's alcoholic drink, and respondent's sister-in-law, Anniyah R., became involved in the argument. At some point during the argument, respondent looked out a window to ascertain that E.Y. was across the street and safe. Respondent retreated to his bedroom to arm himself with a gun kept in the bedroom. On the way to the bedroom, respondent could have departed from the residence, but instead entered the bedroom, where he retrieved and loaded the gun, a 9-mm semiautomatic handgun. Respondent stated to police that, after loading the gun in his bedroom, he chambered a round in the gun, believing that he needed the gun to exit the residence.

¶ 6    When respondent emerged from his bedroom, he observed Allania Y. at the end of the hallway. Anniyah R. rounded the corner into the hallway, and, according to respondent, she was holding a large knife. Respondent fired his gun at both women, killing them. Allania Y. was shot five times, including once in the back of the head, and Anniyah R. was shot at close range three times, including a gunshot to her mouth.

¶ 7    El. Y. was in his room playing video games with a neighbor, Juan. In a statement to the forensic interviewer, El. Y. stated that he heard an argument between his parents, and a bit later, he heard more than one bang. Juan's phone rang and his father told him to hide. Juan hid in the closet and then moved to hide under the bunk beds. El. Y. looked out of the window and saw police arrive. A short time later, the police came to his bedroom door and asked if the children had weapons. El. Y. told them they did not, and the police entered. The police covered the children's heads with blankets or sheets and carried them from the house.

¶ 8    E.Y. was at a neighbor's house playing video games. In his statement to the forensic interviewer, E.Y. stated that he had returned to his house to ask his parents' permission to play a particular video game. He was met at the door by respondent, who shoved E.Y. out of the doorway, causing him to stumble and fall, scraping his arm. E.Y. stated that he observed his mother lying near the front door with her arms at her side.

¶ 9    Other evidence indicated that both children were dealing with psychological issues from the murders of their mother and aunt. Specifically, E.Y. had difficulties sleeping and was attending therapy, but they both were strongly bonded to their maternal grandmother, who was taking care of them and was seeking to adopt them.

¶ 10    On August 4, 2017, the trial court conducted a shelter-care hearing and adjudicated E.Y. and El. Y. wards of the court.  Respondent was arrested and incarcerated for the entirety of the proceedings involving the children.  On July 25, 2019, the State filed its petition to terminate parental rights.  Eventually, on February 20, 2020, the State filed its second amended petition to terminate parental rights, claiming, pertinently, that respondent was unfit because he exposed E.Y. to extreme or repeated cruelty.  On February 20 and 21, 2020, the unfitness hearing was held.  On August 28, 2020, the trial court orally announced it had determined that respondent was unfit on the grounds of extreme cruelty and failure to make reasonable progress toward the return of the minor in specified nine-month periods.  On August 28, 2020, a written order on unfitness was entered, noting only that the trial court had determined respondent to be unfit and stating that it would file a written order containing its factual determinations and reasoning at a later date.  On September 20, 2020, the matter moved to the best-interests phase, and the trial court conducted the best-interests hearing.  On October 20, 2020, the trial court entered its written order memorializing its factual determinations and reasoning regarding respondent's unfitness and the children's best interests.  On October 27, 2020, respondent filed his notice of appeal in this matter.

¶ 11    The appeal was scheduled and briefed in full.  On February 10, 2021, respondent's final brief, his reply, was filed with this court.  On February 19, 2021, respondent pleaded guilty to four offenses in *People v. Ryan Y.*, No. 17-CF-806.  Specifically, respondent pleaded guilty to two counts of second-degree murder (720 ILCS 5/9-2(a)(2) (West 2016)) and two counts of reckless

discharge of a firearm (*id.* § 24-1.5(a)).[1]  Respondent received an aggregate 65-year term of imprisonment for the offenses.

¶ 12                                    II. ANALYSIS

¶ 13    On appeal, respondent challenges only the trial court's unfitness determinations.  Because we find that the extreme-cruelty determination is dispositive here, we consider only respondent's arguments relating to that ground.

¶ 14    The termination of parental rights is governed by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.*, (West 2018)).  *In re J.L.* 236 Ill. 2d 329, 337 (2010).  A termination proceeding proceeds in two steps: first, the parent must be determined, by clear and convincing evidence, to be an unfit person as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)).  *J.L.*, 236 Ill. 2d at 337.  Second, once the parent has been determined to be unfit, the court considers the best interests of the child in determining whether the parent's parental rights should be terminated.  *Id.*  We will not disturb the trial court's determination of parental unfitness unless it is against the manifest weight of the evidence.  *In re J.C.*, 2020 IL App (2d) 200063, ¶ 27.  Finally, any single ground of unfitness proved by clear and convincing evidence is sufficient to support a termination of parental rights.  *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

---

[1] We take judicial notice of the judgment in respondent's criminal case because reviewing courts may take notice of public documents in the records of other courts.  Ill. R. Evid. 201 (eff. Jan. 1, 2011); *Seymour v. Collins*, 2015 IL 118432, ¶ 6 n.1.

¶ 15 Respondent argues that the trial court's extreme-cruelty determination was against the manifest weight of the evidence because there is no evidence that E.Y. "experienced repeated acts of violence or cruelty." Respondent essentially argues that the killing of Allania Y. (and respondent does not mention the killing of 15-year-old Anniyah R. in the same incident) was a one-off and therefore, there was no "repeated" actions. Respondent further argues, literally, that the jury was still out regarding the killings of his wife and her sister. Respondent argues that, because there had been no determination in the criminal case, the trial court's determination in this case was illegitimate. Finally, respondent argues that E.Y. was not an eyewitness to the offenses and that he had a viable claim of self-defense based on his statement to police that Anniyah R. was holding a knife.

¶ 16 Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) defines the various grounds of unfitness sufficient to support a termination of parental rights. Among the grounds is "[e]xtreme or repeated cruelty to the child." *Id.* § 1(D)(e). Most often, we see this ground invoked in instances of repeated and torturous or extreme physical abuse. *In re Mi. S.*, 2016 IL App (3d) 160265, ¶ 25. However, nothing in the language of section 1(D) or specifically section 1(D)(e) limits "extreme cruelty" to only physical acts; had the legislature intended that "extreme cruelty" encompass only physical acts, it would have specified that limitation. *Id.* ¶ 26.

¶ 17 In fact, *Mi. S.* is directly analogous to the facts as developed in this case. In that case, the named minor witnessed the father strike his mother on the head with an iron bar, killing her. *Id.* ¶ 18. The named minor, Mi. S., was also spattered with his mother's blood. *Id.* Two siblings, also at issue in that case, were not home at the time of the offense and thus did not witness the killing. *Id.* However, the trial court in that case determined that the father's act of killing the mother

thereby leaving the minors motherless constituted extreme cruelty with regard to the two minors who did not witness the offense. *Id.* ¶ 28. Regarding Mi. S., the fact that he witnessed his father take his mother's life as well as the fact that he was left motherless by his father's actions constituted extreme cruelty. *Id.* The appellate court concluded that the "violent killing of the minors' mother by their father subjected all three minors to extreme cruelty." *Id.* The appellate court reasoned that "[a]ll three children suffer the consequences of living with the knowledge that their father committed uxoricide — the murder of his spouse, their mother — thereby exposing all three children to extreme emotional and mental cruelty." *Id.* Indeed, "not many intentional acts could be considered more cruel." *Id.* In making this determination, the appellate court further considered the effect on the minors, noting that the "three children [were] not only bereaved by the death of their mother at the hands of their father, but [had] also been uprooted, lost their home, former relationships, and both their parents." *Id.*

¶ 18    *Mi. S.* is strikingly similar to the circumstances presented in this case. Here, E.Y.'s father killed his mother and deprived E.Y. of her presence in his life. In addition, E.Y. is not only bereaved by the death of his mother at his father's hands, but he has been uprooted and lost both parents. See *id.* (court was hard-pressed to see that any act could be considered crueler than murdering a child's mother).

¶ 19    In addition to the similarity to *Mi. S.*, we note that respondent's guilty plea to and conviction of the second-degree murders of Allania Y. and Anniyah R. obviates many of respondent's arguments on appeal. Respondent argues that the trial court's determination that he was responsible for the murders was illegitimate because he had not yet been tried or convicted in the criminal proceeding. Obviously, his guilty plea and the February 19, 2021, sentencing order

puts paid to that contention altogether. Respondent also contends that his constitutional presumption of innocence was somehow violated by the unfitness proceedings. In the hearing, the evidence of his offenses was presented to the trial court, and respondent had the opportunity to fully participate. After the hearing concluded, the trial court determined that the State had proved by clear and convincing evidence that he committed the offenses. Respondent nevertheless contends that the unfitness proceedings presumed his guilt or otherwise violated his constitutional presumption of innocence. However, by his guilty plea and sentence, respondent has admitted that he was, in fact, guilty of the offenses. *People v. Reed*, 2020 IL 124940, ¶ 27 ("[a] guilty plea is an admission of guilt and a conviction in and of itself"). Thus, his claim that the presumption of innocence was violated can no longer stand. Respondent also contends that he had a viable claim of self-defense to the murder charges which had not been adjudicated. However, in pleading guilty to second-degree murder, respondent admitted that his claim of self-defense was unreasonable. 720 ILCS 5/9-2(a)(2) (West 2016) (unreasonable belief in existence of circumstances that would justify or exonerate the killing).

¶ 20    Finally, respondent attempts to distinguish *Mi. S.* Respondent argues that *Mi. S.* is distinguishable because E.Y. was not an eyewitness to the offense. While it is true that E.Y. did not witness his father shoot Allania Y. five times and Anniyah R. three times, respondent completely ignores that *Mi. S.* dealt with three minors, only one of whom was an eyewitness to the father's offense in that case. *Mi. S.*, 2016 IL App (3d) 160265, ¶ 13 (Mi. S. "was the only eyewitness to the incident"). The appellate court nonetheless concluded that "[t]he violent killing of the minors' mother by their father subjected *all three minors* to extreme cruelty." (Emphasis added.) *Id.* ¶ 28. The same is true in this case. E.Y. did not witness respondent, his father, kill

his mother, but respondent has admitted that he did indeed kill E.Y.'s mother. This places E.Y. in the same position as the siblings who did not witness the offense in *Mi. S.*, "suffer[ing] the consequences of living with the knowledge that [his] father committed uxoricide — the murder of his spouse, their mother — thereby exposing [E.Y.] to extreme emotional and mental cruelty." *Id.* However, E.Y. is in an even crueler position that the two siblings who did not witness the killing in *Mi. S.* firsthand: E.Y. came upon the crime scene apparently moments after respondent slaughtered his mother and aunt, and E.Y. observed his mother lying dead upon the floor near the door. Respondent attempts to minimize the horror and trauma E.Y. must have experienced by blandly noting that, in his initial forensic interview, E.Y. only mentioned he saw his mother lying on the floor with her arms at her side, and there was no mention that E.Y. had knowledge of respondent's responsibility for the killing or any trauma that E.Y. experienced. However, neither we nor the trial court are required to abandon our common sense. Despite that E.Y. did not mention the gore he doubtless observed, we note that the State introduced pictures from the scene into evidence; E.Y.'s mother had been shot five times, one of the wounds being a gunshot to the back of her head, and blood is visible throughout the scene. The forensic interviewer's failure to testify that E.Y. did not mention the bloodiness of the scene he observed is not attributable to E.Y., but to the interviewer and the questioning at the hearing. E.Y. was, thankfully, spared the trauma of having to testify about his observations, but there can be no doubt that he must have seen his slain mother lying in a pool of her own blood given the sheer brutality of the offense. There is also evidence that E.Y. was in therapy and that he continued to experience sleep disturbances throughout the case. Therefore, we flatly reject respondent's repugnant attempt to minimize E.Y.'s trauma. Moreover, respondent's claim that E.Y. lacks knowledge of respondent's responsibility

for the killings crumbles because, by respondent's guilty plea and conviction, E.Y. now must carry with him not only the knowledge, but also the *certainty* that respondent killed his mother and aunt. We reject respondent's contention that *Mi. S.* is distinguishable.

¶ 21 Even if we do not consider respondent's guilty plea, the trial court properly considered the evidence presented regarding respondent's responsibility for the offenses. *Mi. S.* does not indicate that the respondent in that case had been criminally adjudicated, and the trial court there was presented with the evidence collected in that case. *Id.* ¶¶ 13-16. From that evidence, the trial court in that case concluded that the State had proved the unfitness allegation of extreme cruelty by clear and convincing evidence. *Id.* ¶ 19. The same is true in this case. The State presented ample evidence of the offenses including respondent's statements to police, El. Y.'s statements to the investigators, E.Y.'s statements to the investigators, and testimony and photographs about the objective physical evidence concerning the offenses. We particularly note that respondent eschewed an opportunity to leave the residence, but instead, proceeded into the bedroom to arm himself with a loaded gun, so he could "safely" exit the residence. We further note that respondent looked out of a window to determine that his biological child was not present at the scene, and both of these actions evidence an intention to commit violence. In addition, there was ample, overwhelming evidence of respondent's criminal responsibility, and we cannot say that the trial court's conclusion was against the manifest weight of the evidence. Moreover, respondent's responsibility for the killing of E.Y.'s mother and aunt constitutes extreme psychological and emotional cruelty (*id.* ¶ 28), and there is no meaningful distinction between *Mi. S.* and this case, as discussed above. Thus, even had respondent not been convicted of the offenses at the time of

this writing, we would still be unable to say that the trial court's determination that respondent was unfit due to exposing E.Y. to extreme cruelty was against the manifest weight of the evidence.

¶ 22    Because a party's parental rights may be terminated upon proof, by clear and convincing evidence, of a single ground of unfitness, we need not consider whether respondent was unfit because he failed to make reasonable progress in the specified nine-month periods pursuant to section 1(D)(m)(ii) (750 ILCS 50/1(D)(m)(ii) (West 2018)). *D.D.*, 196 Ill. 2d at 422. Thus, because the trial court's determination that respondent was unfit based on exposing E.Y. to extreme cruelty was not against the manifest weight of the evidence, we affirm the trial court's judgment.

¶ 23                                    III. CONCLUSION

¶ 24    For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 25    Affirmed.